HIGGINS, Justice.
 

 These cases involve the same issues and were consolidated and submitted in both the lower court and here. The actions are by the joint beneficiaries of a life insurance policy issued on the life of their father on November 2, 1926, for the sum of $5,000, containing a double indemnity clause for accidental death, upon which the present claims are predicated. The plaintiffs allege that the insured’s death was caused from blood poisoning resulting from an accidental injury to his hand. The defendant paid the full amount of the life insurance, but denied liability under the indemnity clause, and, in reconvention, claimed $162.47 had been overpaid to each of the plaintiffs.
 

 There was judgment in favor of the plaintiffs, as prayed for, subject to the credits claimed in the reconventional demand.
 

 The defendant appealed.
 

 The record shows that for about five months prior to the deceased’s death he suffered from splenic anemia and pseuda leukemia, a serious blood disease, which destroys the neutrophiles of the white corpuscles, lowering the resistance to infection. The deceased’s blood test by Dr. Knipmeyer, on December 16, 1933, showed that the neutrophiles, the warriors of the blood which fight infection, had decreased from a normal of 60 per cent, to 70 per cent, down to 9 per cent. The insured also suffered a hemorrhage from his gums where they were affected with pyorrhea, but he was able to attend to his regular business as a planter and operator of a mercantile establishment. On March 2, 1934, in attempting to close the door of his storehouse, he injured his left hand on a brass part of the lock, causing an abrasion about the size of a dime. The same
 
 *623
 
 day, Qr the following day, he was treated by his family physician, Dr. M. H. Phelps, who applied mercurochrome and bandaged the hand. The next day similar treatment was given to the wound. On March 4, 1934, the doctor t advised the deceased to go to the sanitarium at Shreveport, for the purpose of having a general checkup on his condition with reference to his blood trouble. He was admitted to the hospital the samé day and treated by Dr. Arthur A. Herold, who observed that the patient was anemic and feverish, that he had an abrasion on his left hand, which was inflamed and swollen, and that a large red streak ran from his hand up his arm. He was ordered to bed and his temperature was taken and showed 101 degrees F. The infection of his hand and arm was causing him considerable pain. The technician’s blood examination of the patient on March 4, 1934, showed the neutrophiles were 16 per cent., on March 5th, 12 per cent., on March 6th, 7 per cent., on March 8th, 8 per cent., and on March 9th, 5 • per cent. The record also shows that the fever continued to rise until it reached 105 degrees F., the patient dying at 9:30 o’clock p. m. on March 10, 1934.
 

 Dr. Herold testified that, in his opinion, the deceased suffered a streptococcal infection in his hand, which caused septicemia or blood poisoning, which caused the insured’s death. The doctor, under cross-examination, admitted that the chronic blood disease with which the patient was afflicted caused a lowered resistance and made him more vulnerable to the infection, but that in cases of streptococcal infection, resulting in septicemia, even in normal and perfectly healthy people, the mortalit}' was very high. Drs. R. S.'Roy and C. R. Reid gave similar testimony, except that they did not treat the patient.
 

 Dr. W. W. Knipmeyer, witness, for the defendant, testified as to the blood tests he made on December 16, 1933, showing that the condition of the patient was alarming and that he was of the opinion that he would not live very long. Under cross-examination, he admitted he could not say whether the patient could live several months or several years, but was definitely of the opinion that the disease would • eventually be fatal. He further testified:
 

 “Q. Doctor I hand you document marked D-2 for identification and ask you to read the testimony of the witness with reference to what she found on the examination that she made on the morning of March 7th. From what you have just read with reference to her findings on March 7th, 8th and 9th, how does that condition on those days compare with the report made on March 4th?
 

 “A. It seems it is a more serious condition.
 

 “Q. Suppose that a man whose blood was in the condition that you found Mr. DeBlieux’s to be in ón December 16, 1935 should take blood poison, is it not a fact that that blood poison could cause just the result that Mrs. Elsie Lengsfield (the laboratory technician at the sanitarium) found to exist in March 1934?
 

 “A.
 
 I think it could.
 

 "Q. Is it not probable that it would?
 

 “A.
 
 I should think so.”
 

 
 *625
 
 Dr. W. M. H. Harris testified as an expert for the defendant and pointed out that in cases of streptococcal infection the percentage of neutrophiles increase from 60 per cent, to 70 per cent, in a normal person to 85 per cent, and 90 per cent., in order to combat the infection and prevent it from spreading; that, since the blood tests which were made at the sanitarium by Mrs. Elsie Lengsfield showed that the neutrophiles only increased slightly over the report of December 16, 1933, and thereafter decreased until the date of the insured’s death, this indicated the patient was not suffering from blood poisoning 'or septicemia and that the infection was either localized or regional. He stated that it was generally accepted by the medical profession as a fact that, in order to prove beyond any doubt that the patient died of septicemia, it was necessary to make a microscopic examination of the blood culture, in order to isolate the streptococcal germ. He conceded that the prior existing blood condition of the insured would interfere with the neutrophiles multiplying to ward off the infection as in the case of a normal person. Finally, under cross-examination, he stated that he would neither affirm nor deny that the deceased died of septicemia, because there had not been a microscopic examination of the blood culture taken from the patient.
 

 Dr. M. H. Phelps, who was the deceased’s family physician, as a witness for the defendant, testified that, even if a healthy person suffered a severe case of blood poisoning, death would result from that infection. On cross-examination he said:
 

 “Q. You had been treating Mr. De-Blieux for approximately five or ,six months ?
 

 “A. Yes.
 

 "Q. During that time was there any marked change for the worse?
 

 “A.
 
 No, he was about at a standstill at the time, the condition remained practically about the same as it was from the first day I started treating him until he left. * * *
 

 “Q.
 
 If a well man should have a severe case of blood poison is not death the probable result?
 

 “A.
 
 Yes.
 

 “Q. If in the condition that Lestan De-Blieux was in with no immediate expectations of death, and if he had a severe case of blood poison, in that event would you say the blood poison was the predominant cause of death?
 

 “A.
 
 It was at that time I think it helped produce his death.
 

 “Q. Was it the primary cause?
 

 “A. It was the thing that produced his death as early as it was.
 

 “Q.
 
 Is it not a fact that when the germ gets in the blood stream that one gets blood poison irrespective of what his physical condition might have been ?
 

 “A. Yes. * * *
 

 “Q. Where a duly qualified practicing physician has an opportunity of observing a patient in addition to having the report of the laboratory technician is not that doctor in a better position to diagnose a case
 
 *627
 
 than a doctor of equal ability who only has the report of the laboratory technician?
 

 “A. Yes.
 

 “Q. As a matter of fact are not the symptoms of blood poison such that it can be discovered from outward appearances without a great deal of trouble?
 

 “A. Yes.”
 

 The pertinent clause of the policy reads as follows:
 

 “If death should result from bodily injuries, effected directly and independently of all other causes through external, violent and accidental means, within ninety (90) days from the date of the accident, which shall cause such injuries, and of which * * * there is a visible contusion or wound on the exterior of the body, provided, that such (death) does not result, directly or indirectly, from diseases in any form, defendant, will pay on receipt of due proof thereof, Five Thousand Dollars ($5,000.00) to the beneficiaries named in the aforesaid policy.”
 

 The defendant contends that the burden of proof was upon plaintiff to show that the death of the insured resulted from blood poisoning, which was caused by an accidental injury to his handj directly and independently of all other causes, and that death did not result directly or indirectly from disease in any form. He cites in support thereof Couch on Insurance, vol. 5, p. 4014, reading as follows:
 

 • “The concensus of opinion is that, if an injury and an existing bodily disease or infirmity concur and co-operate to that end, no liability exists; if, however, the disease results from the injury, the company is liable, though both co-operate in causing death. The distinction made in this particular is found in that class of cases where the infirmity or disease existed in the insured at the time of the injury, and, on the other hand, that class of cases where the disease was caused and brought’ about by the injury. * * *”
 

 Plaintiffs concede that they had the burden of establishing that death resulted from external, violent, and accidental causes, independent of all other causes, including diseases in any form, and argue that they proved the case by a preponderance of the evidence, citing 1 C.J. p. 452, § 127, as follows :
 

 “The exception operates to relieve the insurer from liability where the injury and an existing bodily infirmity concur and cooperate to produce the disability or death; but the tendency of the courts, under the settled rules of construction applicable to insurance contracts, is to interpret the clause in a manner favorable to the insured, and the insurer is accordingly held liable where the accident can be considered as the proximate cause of death, although disease may have been present as a secondary cause, or where death is the reasonable and natural consequence of the injury, although disease may have supervened, or where the accident is the true cause of death or injury and the disease but the occasion. So also if death results from the accident, the fact that but for weakness or infirmities produced by former illness or disease it would not have been fatal will not prevent a recovery.”
 

 
 *629
 
 In the case of Carnelious v. Louisiana Industrial Life Ins. Co., 18 La.App. 739, 138 So. 533, 535, in which a writ was refused by this court, the plaintiff sued to recover the benefits alleged to be due under the terms of an accident insurance policy as the result of amputation of his leg, due to a severe fracture. The defense was that the accidental injury and loss of the leg was not independent of all other cases of the disablement, since a positive Wasserman test showed that the plaintiff suffered from syphilitic infection. In affirming the judgment of the lower court in favor of the plaintiff, the court said:
 

 “Nothing more than the bare statement of the result of the Wasserman test appears in the record, and there is therefore nothing to indicate the extent, if any, to which this infliction contributed to the necessity for amputation. But the argument is made that, if it had anything whatever to do with the situation, no recovery can be had because the accident must be the sole and independent cause of the disability. Our understanding of the meaning of this clause, as interpreted by the courts generally, is that it suffices if the cause of injury or death be the efficient or predominant cause. The phrase, ‘resulting directly, independently and exclusively in death,’ refers to the efficient, or, as some courts speak of it, the predominant cause of death at the time it occurs. Illinois Commercial Men’s Ass’n v. Parks (C.C.A.) 179 F. 794.
 

 “The total loss of sight consequent upon injury to an eye, caused by running into an obstacle in the nighttime, constitutes a loss within the policy, even though a prior diseased condition of the eye is set up in defense. Travelers’ Ins. Co. v. McInerney (Ky.) 119 S.W. 171.
 

 “In the case of Fetter v. Fid. & Cas. Co., 174 Mo. 256, 73 S.W. 592, 595, 61 L.R. A. 459, 97 Am.St.Rep. 560, the injury complained of was a rupture of the right kidney, the lower part of which was found to be cancerous. In disposing of the contention of the defendant that the rupture was not the sole cause of the death of the insured, the court said:
 

 “ ‘The contention of the defendant is that the accident would not have resulted in the rupture if the cancer had not been there. * * *
 

 “ ‘On this testimony the defendant says that the death was not the result of the accident “independent of all other causes.”
 

 “ ‘If we should give to those qualifying words of the policy the meaning that is now claimed by defendant they were intended to have, there could be scarcely any limit to their nullifying influence. * * *
 

 “ ‘If, therefore, there could be discovered in a man’s body, after his death, any condition, though unsuspected, that, under scientific tests, would render him more amenable to accidents, or less capable of resisting their influence, the policy would not cover the case.’
 

 “In Driskell v. U. S. Health & Accident Ins. Co., 117 Mo.App. 362, 93 S.W. 880, 882, the court said:
 

 “ ‘We think the only reasonable interpretation to be placed upon this clause is to say that the injury must stand out as the predominant factor in the production of
 
 *631
 
 the result, and not that it must have been so virulent in character as necessarily and inevitably to have produced that result, regardless of all other conditions and circumstances.
 

 “ ‘ * * * If, under the peculiar * * * condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death.
 

 “ ‘The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause.
 

 “ ‘In such case, disease and low vitality do not rise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury.’
 

 “In Fid. & Cas. Co. v. Meyer, 106 Ark. 91, 152 S.W. 995, 997, 44 L.R.A.(N.S.) 493, it was held:
 

 “ ‘If the injury, by aggravating the disease, accelerated the death of the assured, then it resulted “directly, independently and exclusively of all-other causes.”
 

 “ ‘In other words, if death would not have occurred when it did but for the injury resulting from the accident, it was the direct, independent, and exclusive cause of death at that time, even though the death was hastened by the diseased condition.’
 

 “In Freeman v. Mercantile Mutual Accident Ass’n, 156 Mass. 351, 30 N.E. 1013, 1014, 17 L.R.A. 753, it was held: ‘The law will not go further back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions. The law does not consider the cause of causes beyond seeking the efficient, predominant cause which, following it no further than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect.’
 

 “The case of Frerichs v. London & Lancashire Indemnity Co. of America, 169 La. 182, 124 So. 821, we consider not in point for the reason that in that case it appears that the predominant cause was not the traumatic injury but the arteriosclerosis. In the case of Kirkwood v. London & Lancashire Ind. Co. of America, 14 La.App. 438, 131 So. 703, the cause of death was an aneurism of the thoracic aorta, which may or may not have been aggravated by the fall. In this case also the efficient predominant cause of death was the disease and not the traumatic injury.”
 

 See, also, White v. Standard Life, etc., Ins. Co., 95 Minn. 77, 103 N.W. 735, [884] 885, 5 Ann.Cas. 83; Berry v. Mutual Life Ins. Co. of N.Y. [La.App.] 147 So. [528] 529.
 

 Counsel for the defendant contend that the above cases are not in point, because in the instant case the policy contained the proviso “that such death does not result directly or indirectly .from disease
 
 *633
 
 in any form,” which provision was not in the policy in the cited cases, or those referred to therein. We disagree with counsel, and are of the opinion that the authorities are pertinent, because, if the traumatic injury resulted in septicemia, which caused the insured’s death, the proviso in the policy in this case “that death shall not result indirectly from disease” would not apply here. Furthermore, the proviso is merely for the purpose of emphasizing the preceding language of the policy — that the death must result from “bodily injuries, effected directly and independently of all other causes through external, violent and accidental means.” Proof to that extent necessarily makes the disease proviso inapplicable.
 

 In the instant case, plaintiff offered positive evidence of a visible wound to the exterior part of the insured’s body, inflicted through external and accidental means. The history and clinical record of the case up until the deceased’s death is typical of septicemia infection, all the symptoms of that deadly streptococcal infection being present, as shown by the testimony of the admittedly competent Dr. Herold. The defendant’s expert evidence is negative in character, in that Dr. Harris points out that the most positive way to determine if the insured died of septicemia was by microscopic examination of the blood. He refused to either deny or affirm that the insured died of septicemia. We therefore conclude, as did the trial judge, that the plaintiff has shown by a preponderance of the evidence that the deceased died of septicemia resulting from the accident and the infection, and not from the chronic blood disease with which he was afflicted. Counsel for defendant cite: Crandall v. Continental Casualty Co., 179 Ill.App. 330; Stanton v. Travelers’ Ins. Co., 83
 
 Conn.
 
 708, 78 A. 317, 34 L.R.A.(N.S.) 445; Young v. Continental Casualty Co., 128 S.C. 168, 122 S.E. 577; Rathman v. New Am. Cas. Co., 186 Mich. 115, 152 N.W. 983, L.R.A.1915E, 980, Ann.Cas.1917C, 459; Ward v. Aetna Life Ins. Co., 85 Neb. 471, 123 N.W. 456; Ogilvie v. Aetna Life Ins. Co., 189 Cal. 406, 209 P. 26, 26 A.L.R. 116; Smith v. Mass. Bonding & Ins. Co., 207 App.Div. 682, 202 N.Y.S. 857; Ludwig v. Preferred A. Ins. Co., 113 Minn. 510, 130 N.W. 5, to the effect that the accidents to persons Suffering from pre-existing disease or bodily infirmity where death results from the accidental injury and the pre-existing disease or infirmity act together there can be no recovery.
 

 We agree with the counsel for defendant in that this is the law, but upon reading those cases we find that the accidents complained of would not ordinarily produce death without the intervention of disease. The authorities cited by counsel for defendant are not apposite here, because in this case we have an accident, which caused septicemia, which is a disease, but which is caused directly from the accidental injury and for that reason is not excluded. Then, after developing into a case of septicemia, the insured would naturally be expected to die even though he had no pre-existing bodily infirmity or blood disorder.
 

 
 *635
 
 There is no dispute as to the claims made in reconvention, and they will be allowed.
 

 For the reasons assigned, the judgment appealed from is affirmed.