ODOM, Justice.
 

 The defendant, Equitable Life Assurance Society of the United States, has appealed, from a judgment ordering it to pay to thee plaintiffs the sum of $21,871.60, with legal interest from January 25, 1940, which amount the trial judge held was due under-the double indemnity clauses of a life insurance policy issued on the life of John, E. Doughtie.
 

 Plaintiffs-appellees answered the appeal, averring that the finding of the trial court on the issue of liability is sustained by the evidence and is correct. They allege, however, that the judge erred as to the quantum allowed plaintiffs and aver that judgment should have been rendered against-the defendant for the full sum of $25,000, with interest at the rate of 6 per cent per annum from December 28, 1939, until paid, and all costs of the suit. They pray that the judgment appealed from be amended by increasing the amount therein allowed-plaintiffs-appellees from the sum of $21,-871.60, with legal interest from January 25, 1940, to the sum of $25,000, with interest, etc.
 

 Our learned brother of the district bench wrote and filed in the record an elaborate and very able opinion in which he stated clearly and accurately the issues involved in this litigation, as well as his findings of
 
 *741
 
 the facts involved and his conclusions based upon the facts. Counsel for the respective sides seem to find no fault with his statement of the issues involved. Since we can state the issues no more concisely than he did, we quote the following extract from his opinion:
 

 “On November 23, 1923, the defendant issued a policy of life insurance insuring the life of John E. Doughtie in the principal sum of $25,000.00 containing the usual double indemnity clause. His wife, Mrs. Myrtle Kendall Doughtie, was named as the primary beneficiary.
 

 “Mr. Doughtie died on December 28, 1939. The face value of the policy was in due course paid to the surviving widow. Mrs. Doughtie died on June 30, 1940, leaving a last will and testament in which her niece Miss Myrtle Lipscomb was named as universal legatee. The present suit was instituted by Miss Lipscomb after being recognized and placed in possession of the property of the deceased as the universal legatee.
 

 “Subsequent to the trial and after the case had been submitted for decision Miss Lipscomb died on August 7, 1942. J. C. Lipscomb and Mrs. Mabel Kendall Lipscomb, the father and mother of Miss Lipscomb, were duly recognized as sole heirs of the deceased and were substituted as parties plaintiff in this cause.
 

 “As a cause of action the petition alleges-that Mr. John E. Doughtie’s death resulted solely from food poisoning and was ■therefore caused directly, exclusively and independently of all other causes by external, violent, and accidental means within the provisions of the policy of insurance providing for the payment under the double-indemnity provisions.
 

 “The defendant alleges that the death of Mr. Doughtie was the result of or was caused directly or indirectly by disease or illness or physical infirmity. Further, it is alleged that the predominant cause of his. death was the heart diseases, involvements and disorders with which and from which deceased had been suffering.
 

 “The principal facts in the case are undisputed. On October 21, 1937, a total and permanent disability claim was approved under which the defendant waived the premiums beginning November 23, 1937. Mr. Doughtie was shown to have been suffering with a serious heart condition at that time. On November 15, 1937, his condition was described by his attending physician as follows:
 

 “ ‘Arterio-Sclerosis — and Endocarditis— At present his main symptoms are an unbalanced emotional center — cries at different intervals — a very unstable gait — staggers a lot when walking — with a marked numbness in both legs from hips down. Also a shortness of breath.’
 

 “On November 3, 1939, just prior to Mr. Doughtie’s death, the report to the defendant company reflected the following condition:
 

 “ ‘severe myocarditis — hypertrophy of heart and leakage of all valves; marked shortness of breath and pain in region of heart.’
 

 “Mr. and Mrs. John E. Doughtie returned to Shreveport from a visit to Mon
 
 *743
 
 roe on the afternoon of December 27, 1939. They obtained stuffed crabs at a local delicatessen for their evening meal. Shortly before 10 o’clock p. m. on that evening they both became sick and Dr. I. F. Hawkins, the family physician, who prepared the reports to the defendant company quoted above, was called. Mr. Doughtie was complaining of pain in his shoulders, neck and principally in the area of the epigastrium. Prior to calling the doctor Mr. Doughtie had taken nitroglycerin and emperium which had previously relieved pain but was ineffective on this occasion. Mr. Dough-tie was given panopon by the doctor in addition to the other medicine previously taken. Mrs. Doughtie made the same complaints as Mr. Doughtie and while the doctor was present she vomited. Her husband was nauseated but did not vomit. They both went to bed and a practical nurse was called.
 

 “About six o’clock the next morning Dr. Hawkins was called and found Mr. Dough-tie dead and Mrs. Doughtie in an unconscious condition. She was removed immediately to the sanitarium. Her pulse was almost imperceptible. She regained consciousness about 11:30 A. M. and vomited almost continuously the remainder of the day. She suffered from nausea and continued vomiting through the 29th and 30th. According to Dr. Hawkins, Mrs. Dough-tie was at the point of death for about one and a half days. For some time after her recovery Mrs. Doughtie suffered from severe gastritis and pains in her stomach, conditions which had never been present prior to this occasion.”
 

 The principal amount of the policy was $25,000. The double indemnity provisions of the policy are written in two separate and distinct clauses. On the face of the policy there appears this clause: .
 

 “* * * an(j jn event 0f death from accident the Society agrees to increase the amount so payable to Fifty Thousand Dollars upon due proof that the death of the Insured resulted solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means, subject to the terms and conditions contained on the third page hereof.”
 

 On the third page of the policy is written this clause:
 

 “The increased amount of insurance as stipulated on the face hereof, in case of accidental death shall be payable upon receipt of due proof that the death of the Insured occurred while this policy was in full force and effect, and resulted solely from bodily injuries, caused directly, exclusively and independently of all other causes by external, violent and purely accidental means * *
 

 Plaintiff’s contention is that Mr. Dough-tie, the insured, died as a result of food poisoning. Counsel for defendant concede that, if that be true, the company is liable under the double indemnity provisions of the policy. They deny, however, that Mr. Doughtie’s death was due to food poisoning. They admit, however, that Mr. Doughtie had “an attack of food poisoning” just prior to his death. Counsel for the insurance company say in their brief at page 10:
 

 
 *745
 
 “Dr. Hawkins diagnosed Mrs. Doughtie’s condition as being the result of food poisoning, which was undoubtedly correct. It was also his opinion that Mr. Doughtie had had an attack of food poisoning which was in all probability also correct.”
 

 Counsel for the insurance company seem to concede, as they must, that death resulting from food poisoning is considered by all authorities as accidental. The following extract is quoted from American Jurisprudence, Volume 29, p. 744:
 

 “All the cases where death directly resulted from ptomaine poisoning or poisoning due to bad food agree upon the proposition that such death is effected by accidental means.”
 

 And the following extract is quoted from Cyclopedia of Insurance Law, by Couch, Volume 5, Section 1141, p. 403:
 

 “And the authorities agree that death directly from poisoning following the unintentional eating of bad, but apparently wholesome food, is effected by accident, or is the result of accidental means, unless causes of such a character are expressly excepted.”
 

 See also the case of Anna Christ v. Pacific Mutual Life Ins. Co., 312 Ill. 525, 144 N.E. 161, reported in 35 A.L.R. 730, and the note on page 739 following that case.
 

 Counsel for the defendant insurance company say in their brief at page 15: “The clearly expressed intent of the contract is that if at the time the insured sustains bodily injury or suffers death by accidental means, he is suffering from some disease or bodily infirmity which acts as a material contributing factor in causing the injury or death, there can be no recovery.” They say further in their brief on the same page that their contention is that: “The. plaintiff has completely failed to prove by a reasonable preponderance of the evidence that the death of the assured resulted solely from bodily injuries exclusively of all other causes, and certainly the evidence does not exclude the possibility that a preexisting substantial infirmity contributed to the death of the assured.”
 

 Counsel rely upon the admitted fact that for several years prior to his death Mr. Doughtie was a very sick man. On November 15, 1937, his condition was described by his attending physician as follows :
 

 “Arterio-Sclerosis — and Endocarditis— At present his main symptoms are an unbalanced emotional center — cries at different intervals — a very unstable gait — stagt gers a lot when walking — with a marked numbness in both legs from hips down. Also a shortness of breath.”
 

 On November 3, 1939, just prior to Mr. Doughtie’s death, the report to the defendant company reflected the following condition :
 

 “severe myocarditis — and hypertrophy of heart and leakage of all valves; marked shortness of breath and pain in region of heart.”
 

 The sum and substance of the defendant’s contention is that plaintiffs have failed to prove that Mr. Doughtie’s death was not due to the diseases and infirmities with which he was afflicted, as shown by his own physician’s report; in other words, that, according to the record, it is highly
 
 *747
 
 probable, to say the least, that his death was due to heart failure, and that, even if he had not had the attack of food poisoning, his death might have occurred when it did anyway.
 

 But the record shows beyond question that counsel are mistaken. Mr. Doughtie had been under the care of physicians for a number of years. These physicians had advised him that it was necessary for him to retire from business entirely, to avoid as completely as possible all physical activities, and to lay aside all responsibilities which might have a tendency to cause
 
 excitement.
 
 Dr. James E. Walsworth, who had attended and advised Mr. Doughtie as early as 1937 while he lived at Monroe, testified that the patient had taken the advice of his physicians, and that his condition was growing no worse. Dr. Walsworth .testified that the patient’s heart “had sufficiently enlarged and its walls sufficiently thickened- to take care of or to compensate for this ossification of the valves. And he had not suffered any evidence of the loss of that compensation, as would be manifested by swelling of the feet, by general edema, by congestive coughs, as I spoke of a while ago; those things and many other factors.”
 

 Five physicians testified that, since the patient had adjusted his activities to correspond with the condition of his heart and arteries, there was no reason why he should not have lived on for a number of years, and that as a matter of fact innumerable persons afflicted as Mr. Doughtie was do live on and on for years. The testimony shows that as a matter of fact Mr. Dough-tie was not suffering any special inconvenience due to the condition of his heart and his arteries. Just prior to his death, he- and his wife had visited relatives in Monroe. The trip was made by automobile,, driven by Mr. Doughtie’s wife. He suffered no inconvenience while making the trip to and from Monroe, and none during his stay there. The .testimony shows also-that he made frequent automobile trips; with a friend out into the oil fields near the-City of Shreveport, and that apparently he enjoyed these outings. Following the advice of his physicians, he avoided all such activities as might bring on excitement or involve physical strain.
 

 Now, as to the immediate or proximate cause of his death, we must necessarily rely upon the opinions expressed by the physicians who testified at the trial.
 

 Dr. I. F. Hawkins, the family physician,, who was called to attend Mr. Doughtie and his wife -the night they had the attack of food poisoning, expressed the unqualified opinion that the direct and immediate cause of Mr. Doughtie’s death was food poisoning. He said: “I say there is no way in the world to say that it [the food poisoning] would not have killed him if he had not had any heart condition at all.”
 

 In explaining his testimony that in his opinion food poisoning was the direct and immediate cause of Mr. Doughtie’s death, Dr. Hawkins stated that he took into consideration the condition of Mrs. Doughtie, who was stricken at the same time as a result of eating crabmeat which had been purchased at a delicatessen on their arrival in Shreveport from their visit to Monroe. Mr. and Mrs. Doughtie each ate portions of the crabmeat. Dr. Hawkins
 
 *749
 
 testified that, when he visited Mr. and Mrs. Doughtie in the late evening of that day, he found them both desperately ill. Mrs. Doughtie, he said, narrowly escaped death. In fact, he said, she lay at the point of death for at least 24 hours, and he attributed her recovery to the fact that she vomited and so eliminated some of the poison from her system. He said that Mr. Doughtie did not vomit. While he did not say so in so many words, his testimony conveys the impression, at least, that, if Mrs. Doughtie had not vomited, she also would probably have died. Mrs. Doughtie, according to Dr. Hawkins’ testimony, was in a much better state of health, and was much stronger, than her husband.
 

 Dr. Walsworth, former family physician, who was thoroughly familiar with Mr. Doughtie’s general condition, was asked whether he considered Dr. Hawkins correct in his diagnosis that the immediate or proximate cause of Mr. Doughtie’s death was food poisoning. He answered: “His diagnosis was not only justified but confirmed by the clinical course of Mrs. Doughtie, together with the pathological findings, on autopsy, for Mr. Doughtie, which positively ruled out the fact of a heart complication there as the cause of death.”
 

 Dr. Charles S. Boone, an assistant coroner and a practicing physician, testified that he had examined the report of the autopsy, and that he saw nothing in his study of the heart which would indicate that deceased had suffered a heart attack of any kind. He stated further that it was his opinion that Mr. Doughtie had died of food poisoning; that he did not believe that a myocardiogram of the heart would show that the heart had been influenced enough by the attack of food poisoning to have caused death, and that in this case he was “of the opinion that this heart did not have very much to play in the cause of this man’s death”.
 

 Dr. R. W. Mathews, a pathologist who was consulted in connection with Mr. Doughtie’s death, testified that, although a “crippled heart” would not be expected to stand the extra load that would be put on it by a “severe intoxication or severe infection”, yet “where the intoxication is in the nature of food poisoning you have no way to know whether or not this man with the crippled heart might not have died from the intoxication had he had a normal heart”, and that he considered the clinical diagnosis of food poisoning justified.
 

 Dr. H. W. Paul, chief deputy coroner, who performed the autopsy, was called by plaintiffs. The cause of death was given in the certificate which he had prepared after the autopsy as “aortic insufficiency”. Dr. Paul testified that there were extensive pathological changes in the body of the deceased, the most prominent of which was aortic insufficiency, and that in his opinion this had been the immediate cause of death, although that did not “exclude any other thing that might have been associated with it to have caused his death”. He testified also, however, that there was sufficient evidence of gastritis to corroborate Dr. Hawkins’ clinical findings; that it was his opinion that there had been little pathological change in Mr. Doughtie’s heart within the last six months of his life, and that there was no evidence, so far as the autopsy was
 
 *751
 
 concerned, to show that the heart had not been functioning as usual.
 

 The only witness called by defendant was Dr. A. A. Herold. His testimony, when read and construed as a whole, shows that he did not dispute plaintiffs’ theory that the predominant, or efficient, cause of Mr. Doughtie’s death was food poisoning. He was asked whether in his opinion Mr. Doughtie’s heart condition, as reflected by the facts brought out at the trial, “could be considered as a cause of the death of Mr. Doughtie”. His answer was that, “taken in conjunction with those findings in the stomach and intestines, it will be my opinion that there was some gastritis, that is, inflammation of the stomach, caused either by digestive disturbance or by some poison, and which may have been a factor in determining the heart attack and death itself, but inasmuch as he died as early as he did I do not think it could have been the cause of death”.
 

 He was asked what in his opinion, considering the facts as disclosed by the testimony, would be considered “the predominant cause of death”, and he answered :
 

 “Well, it is my opinion, considering the fact that he had, undoubtedly, not only from the pathological findings but also from the history as you related it to me, a very definite heart failing condition. That was the predominant cause of his death and something else probably precipitated this attack.”
 

 He was asked what effect food poisoning would have on the heart — that is, whether “it would create a strain on the heart”? His answer was:
 

 “The only thing that would cause a strain would be irritation of the stomach, which we know existed in this case. He probably gagged. I understand he did not vomit, as best I could learn, but probably gagged and strained. And, if so, it would affect the heart. Of course, it was brought out that he absorbed poison from the stomach, which would affect the nervous system of the heart.”
 

 Dr. Herold’s theory seems to be that Mr. Doughtie died of heart failure, but*he concedes that the heart failure was probably precipitated, or brought on, by gastritis, or inflammation of the stomach, “caused either by digestive disturbance or by some poison”. He testified that it was known that there was irritation of the stomach, which probably caused Mr. Doughtie to gag or strain. And, if so, he said, “it would affect the heart”. It was food poisoning which brought on the irritation of the stomach, and it was the food poisoning which caused him to gag or strain, and, according to Dr. Herold, the gagging or straining affected his heart. Dr. Herold’s testimony in the main supports the theory of the other physicians, which was that the food poisoning was the proximate or direct cause of death.
 

 The trial judge, after reviewing and summarizing the testimony of all the physicians, including that of Dr. Herold, said in his written opinion: “Certainly the preponderance of the testimony on this subject favors the plaintiff. In fact, the defendant’s testimony does not directly refute
 
 *753
 
 the testimony of plaintiffs’ experts as to the proximate cause of Mr. Doughtie’s death,” We concur in this view expressed by the district judge, and go further and state that in our opinion the testimony ■shows beyond question that the proximate <or efficient cause of Mr. Doughtie’s death was food poisoning.
 

 In the case of De Blieux v. Travelers Ins. Co., 185 La. 620, 170 So. 14, we had occasion to interpret a similar double indemnity clause in a life insurance policy. In that case we commented extensively, and with approval, on the ruling in the case of Carnelious v. Louisiana Industrial Life Ins. Co., decided by the Court of Appeal, Parish of Orleans, and reported in 18 La.App. 739, 138 So. 533. In the De Blieux case we quoted with approval the following extract from the case of Driskell v. United States Health & Accident Ins. Co., 117 Mo.App. 362, 93 S.W. 880:
 

 “ ‘ “We think the only reasonable interpretation to be placed upon this clause [the ■double indemnity clause similar to the one in the case at bar] is to say that the injury must stand out as a predominant factor in the production of the result, and not that it must have been so virulent in character as necessarily and inevitably to have produced that result, regardless of all other conditions and circumstances.
 

 “ ‘ “* * * If, under the peculiar * * * condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death.
 

 “ ‘ “The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction of the sole producing cause.
 

 “ ‘ “In such case diseases and low vitality do not rise to the dignity of concurrent causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury.” ’ ” [185 La. 620, 170 So. 18]
 

 We quoted also with approval the following statement from the case of Fidelity & Casualty Co. v. Meyer, 106 Ark. 91, 152 S.W. 995, 44 A.L.R.,N.S., 493:
 

 “ ‘ “If the injury, by aggravating the disease, accelerated the death of the assured, then it resulted ‘directly, independently and exclusively of all other causes.’
 

 “ ‘ “In other words, if death would not have occurred when it did but for the injury resulting from the accident, it was the direct, independent,
 
 and
 
 exclusive cause of death at that time, even though the death was hastened by the diseased condition.” ’ ”
 

 In the case of Kelly v. Prudential Ins. Co., 334 Pa. 143, 6 A.2d 55, 58, the Supreme Court of Pennsylvania, in interpreting a double indemnity clause similar to that found in the policy here under consideration said:
 

 “The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its
 
 *755
 
 distinction as the sole producing cause. In such case disease and low vitality do not arise to the dignity of concurring causes, hut, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury.”
 

 In that case, the Pennsylvania Supreme Court then quoted with approval the following extract from the case of Kelley v. Pittsburgh Casualty Co., 256 Pa. 1, 100 A. 494, 495:
 

 “If liability is to depend upon the physical condition of the assured as contributing in some degree to death, then it should be so stated plainly in the policy. * * * The phrase ‘resulting directly, independently, and exclusively in death’ refers to the efficient, or, as some courts speak of it, the predominant, cause of death at the time it occurs. In other words, it means the proximate cause.”
 

 The De Blieux case, the Carnelious case, and the case of Berry v. Mutual Life Ins. Co., decided by the Court of Appeal, Second Circuit, reported in 147 So. 528, are the leading Louisiana cases which interpret the meaning of double indemnity clauses in life and accident insurance policies such as the one involved in the case at bar.
 

 Counsel for defendant cite the Louisiana case of Frerichs v. London & Lancashire Indemnity Co., 169 La. 182, 124 So. 821. That was a suit on an accident policy, and the insurance was “against loss caused by bodily injuries effected directly and independently of all other causes through accidental means”. The facts were that, while the insured was wading in water catching crabs, he fell, struck his head against a. post, and soon died. The cause of death was cerebral hemorrhage. The issue involved was whether he was stricken with the hemorrhage before he fell against the-post and whether the fall was due to the-hemorrhage, or whether the fall and the striking of his head against the post caused the hemorrhage. The court held that the testimony showed that the hemorrhage which caused death was the result merely of arterio-sclerosis and not effected by traumatic injury. The plaintiff’s demands were therefore rejected.
 

 In the instant case, the trial judge concluded and held that food poisoning was. the efficient or proximate cause of Mr. Doughtie’s death. His ruling was clearly correct, and we approve it.
 

 The remaining question is whether the amount of the judgment is correct. The trial judge found and held that the plaintiffs were entitled to recover $21,871.-60, with interest at 5 per cent per annum from January 25, 1940, until paid, and rendered judgment in their favor, and against the defendant, for that amount, plus costs. The appellees answered the appeal, prajing that the judgment be amended by increasing the amount to $25,000, plus interest and costs.
 

 - Counsel for appellant, the insurance company, do not mention this point in their brief. Plaintiffs alleged in Paragraph 3 of their petition that the “insured paid all premiums due under the policy and did and performed all things necessary to maintain the same in full force and effect. In answer to that paragraph, the defendant ad
 
 *757
 
 mitted “that said policy was maintained in full force and effect”, and further alleged in the same paragraph:
 

 “In this connection, your defendant •shows that under date of October 21, 1937 a total and permanent disability claim was approved under which the Society waived the premiums beginning November 23, 1937, and the amount of the insurance afforded by the policy being reduced by the amount •of all premiums so waived. Your defendant further’ shows that the amount of premiums waived reduced the amount of the policy to'$21,871.60.”
 

 Mr. Doughtie’s life was insured for the sum of $25,000, payable “upon receipt of •due proof of death of the Insured”. The policy provided further that “in event of death from accident the Society agrees to increase the amount so payable to Fifty Thousand Dollars”. We have held that Mr. Doughtie’s death was due to accident.
 

 Defendant admits in its answer “that said policy was maintained in full force and effect” to the date of the death of the insured; so that at Mr. Doughtie’s death the amount "so payable” under the policy was $50,000, less the amount of certain premiums which had been waived by the company. The policy contains the stipulation that, in case the insured, after attaining the age of 60 years and while the policy is in full force and effect, “becomes totally and permanently disabled * * *, the Society * * * will on each subsequent anniversary date of this policy during the continuance of such disability, waive payment of the premium, if any, for the ensuing policy year, whereupon the
 
 amount of insurance
 
 shall become reduced by the
 
 amount of premiums so waived
 
 and subsequent premiums and loan and surrender values shall be reduced proportionately”. (Italics are the writer’s.)
 

 After Mr. Doughtie attained the age of 60 years, and while the policy was in full force and effect, he became totally and permanently disabled, and upon his application the insurance company waived all premiums on the policy for the years 1937, 1938, and 1939, the premiums waived amounting in the aggregate to $3,128.40. Under the terms of the policy, “the amount of insurance” was reduced “by the amount of premiums so waived”. The premiums waived included the premium charged for the double indemnity feature of the policy. Plaintiffs concede, of course, that the defendant is entitled to deduct from the “amount of insurance” the
 
 aggregate
 
 amount of the “premiums so waived”. Their contention, however, is that, in a settlement previously agreed upon and made by .the parties, the defendant was allowed to deduct, and did deduct, from “the amount of insurance” the aggregate amount of the “premiums so waived”.
 

 The facts relating to that settlement are these: The plaintiffs contended from the beginning that Mr. Doughtie’s death was due to accident, and that for that reason the amount of insurance due under the policy on the date of his 'death was not $25,000 but $50,000. The defendant denied that the death was due to accident and contended that the “amount of insurance” due was only $25,000. Without waiving any of their rights under the policy and without prejudice, the parties entered into
 
 *759
 
 a settlement in which the insurance company received credit for “the amount of premiums so waived”. The defendant admits this in Paragraph 9 of its answer, which we here quote in full:
 

 “The allegations of Paragraph 9 are denied, except it is admitted that the Equitable Life Assurance Society of the United States paid to Myrtle Kendall Doughtie $13,701.70 in settlement of the face amount of the policy sued upon, which amount was arrived at, as follows:
 

 Amount of policy (reduced by premiums waived) $21,871.60
 

 Dividend additions 330.00
 

 Post Mortem dividend 21.56
 

 Interest allowed 99.39
 

 $22,322.55
 

 Less
 

 Policy Loan $8,571.53
 

 Accrued interest on loan 49.32 8,620.85
 

 Balance $12,701.70”
 

 The “amount of premiums so waived” in this settlement is the difference between $25,000 (referred to as “amount of policy”) and $21,871.60 — or $3,128.40. We must assume that in making this settlement the defendant took credit for the full amount due it on - account of premiums waived. This settlement is final. It was based upon the assumption that “the amount payable” under the policy was only $25,000. But we hold that the amount payable at Mr. Doughtie’s death was not $25,000 but $50,-000. The defendant must now pay plaintiffs the balance due, which is $25,000.
 

 But defendant contends, and the trial judge held, that defendant owes plaintiffs only $21,871.60, which is $25,000 less $3,-128.40, the exact amount which was deducted in the original settlement for premiums waived.
 

 We are unable to find any sound basis for defendant’s claim and the ruling of the judge. Aside from the amount of the policy loan and the interest, amounting to-$8,620.85, the defendant was entitled to deduct nothing from the amount payable under the policy except the aggregate amount of the premiums waived. It has deducted -that amount once — in the first settlement. If it is permitted to deduct the same amount in the final settlement, the result will be that it will get credit for twice the amount of the premiums waived.
 

 Defendant’s method of calculating the balance due is this: The amount payable under the policy, disregarding the provision relating to death by accident, was $25,000. Defendant deducts from this amount the sum of $3,128.40, the aggregate amount of the premiums waived up to the date of Mr. Doughtie’s death, thereby reducing the amount “payable” under the policy to $21,-871.60; and, since death was due to accident, it doubles this amount in order to arrive at the correct sum payable under the policy at the date of the assured’s death. The total amount payable under the policy at Mr. Doughtie’s death, according to this-calculation, was twice $21,871.60, or $43,-743.20, which, defendant says, in effect at least, was the amount payable under the policy at the assured’s death, and, since the beneficiaries have already been paid $21,-871.60 ($25,000 less premiums waived, amounting to $3,128.40), they are entitled to receive in final settlement only $21,871.-60.
 

 
 *761
 
 This calculation overlooks a very significant and pertinent provision of the policy, which is the clause providing that “in event of death from accident the Society agrees to increase the amount so payable to Fifty Thousand Dollars”. This does not mean that in the event of death by accident the company will pay double the face value of the policy as reduced by the amount of premiums waived. It means what it says, which is that in event of death from accident the company will increase the amount so payable to $50,000. The policy was in full force and effect on the date of assured’s death, and the only penalty inflicted upon the beneficiaries was that the amount payable at death was reduced by the amount of the premiums waived.
 

 For the reasons assigned, the judgment appealed from is amended so as to increase the amount due plaintiffs by defendant from $21,871.60, with interest and costs, to $25,-000, plus interest and costs; and as thus amended the judgment is affirmed.