Cheryl Sawyer GAY, Appellant,

and

Michael Wayne Gay, Jr., an infant who sues by his mother and next friend, Cheryl Sawyer Gay, Patrice Marlene Gay, an infant who sues by her mother and next friend, Cheryl Sawyer Gay, Patrick Barlow Gay, an infant who sues by his mother and next friend, Cheryl Sawyer Gay, Plaintiffs,

v.

AMERICAN MOTORISTS INSURANCE COMPANY, Appellee.

Cheryl Sawyer GAY, Appellee,

and

Michael Wayne Gay, Jr., an infant who sues by his mother and next friend, Cheryl Sawyer Gay, Patrice Marlene Gay, an infant who sues by her mother and next friend, Cheryl Sawyer Gay, Patrick Barlow Gay, an infant who sues by his mother and next friend, Cheryl Sawyer Gay, Plaintiffs,

v.

AMERICAN MOTORISTS INSURANCE COMPANY, Appellant.

Nos. 82–1337, 82–1396.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 7, 1982.

Decided Aug. 9, 1983.

Edward Colston Newton, Newport News, Va. (John F. Rixey, Rixey, Heilig & McHenry, Norfolk, Va., on brief), for appellant.

John F. Newhard, Jr. (James A. Howard, James A. Howard, II, Breeden, Howard & MacMillan, Norfolk, Va., on brief), for appellee.

Before WIDENER, HALL and ERVIN, Circuit Judges.

WIDENER, Circuit Judge:

Cheryl Gay brought this diversity action in the Circuit Court of York County, Virginia, on a policy of accident insurance on account of the death of her husband. The defendant removed the case to the United States District Court. After a jury trial and a plaintiff's verdict for compensatory and punitive damages, the trial court entered judgment for the defendant, notwithstanding the verdict.[1] The plaintiff appealed, and we affirm.

Michael Gay, Sr., the plaintiff's late husband, learned that he had cancer in mid-July 1980. After pulling a muscle in his right arm his right arm and neck swelled grotesquely, and the physicians who treated him discovered near his right lung a small cancerous tumor which impinged upon Gay's superior vena cava, the vein through which blood returns to his heart from his right arm, shoulder, neck, and head. This impairment of Gay's circulatory system, known as superior vena cava syndrome, caused the swelling of his arm.

Gay's physicians also discovered that cancerous cells from the lung tumor had metastasized to his brain. Throughout the month of July, Gay received cobalt radiation therapy for the lesion on his brain and on August 18, 1980, he received a chemotherapy treatment.

On August 29, 1980, while changing the oil of his car, Gay scraped his arm on the underside of the car. A couple of days later, Gay started to complain about his arm, and, on the evening of September 1, he went to the hospital for treatment. Gay's forearm and upper arm were swollen and discolored, and his vital signs were abnormal. He was critically ill. Although treated with antibiotics, Gay died the morning after he was admitted to the hospital.

The policy involved had insured Gay's life against accidental death. The contract described the coverage as follows:

When injury results in any of the following losses to an Insured Person within 365 days after the date of the accident causing such injury, the Company will pay the [agreed] sum . . . .

The term "injury" is defined by the contract as

"bodily injury caused by an accident occurring while the Policy is in force as to the Insured Person and resulting directly and independently of all other causes in loss covered by the Policy."

The parties agree that the immediate cause of the death of Michael Gay was septicemia, caused by an abrasion, leading to multiple organ failure. What they disagree over is whether the death from septicemia resulted directly from the accidental abrasion, independently of all other causes, including Gay's cancer and the complications it caused.

The overwhelming weight of the medical evidence supports the defendant's contention that the abrasion did not directly cause, independently of all other contributing causes, the death of Michael Gay. Because of the cancer, the resulting vena cava syndrome, and chemotherapy, Michael Gay had a severely impaired lymphatic, circulatory and immune system, which allowed him to succumb to an infection that he otherwise would have resisted.

Dr. Mattern, the plaintiff's expert at trial and the decedent's last attending physician, testified that Gay had a white blood cell count of 1200 the day before he died. A normal count ranges from 4000 to 9000, and a normal person with a systemic infection will have a white blood cell count as high as 15,000. Dr. Mattern testified that Gay had

---

1. The trial court also directed a verdict against Cheryl Gay's children who claimed to be entitled to recover under the contract of insurance. No appeal was taken from this holding.

The case was tried before a United States Magistrate.

a lowered white blood cell count on September 1 because he underwent chemotherapy on August 18. If Gay had not received these drugs, his count would have been about 15,000 when he developed septicemia.

The effect of the depressed white blood cell count, known medically as leukopenia, which was a chemically induced side effect of the chemotherapy, was an impaired immune system that was unable to fight off the streptococcus infection. Furthermore, on September 1, 1980, Gay still suffered from vena cava syndrome. The pressure of the cancer on the vena cava with the resulting impairment of the circulatory system contributed along with the infection itself to the swelling of Gay's arm before his death. That condition thus impaired the operation of Gay's circulatory and lymphatic systems. Dr. Mattern testified that the cancer caused vena cava syndrome and its effects and the chemotherapy-induced leukopenia were both significant contributing causes of death; if not for the cancer and the chemotherapy and the effects of each, Gay would have been able to fight off the infection. Dr. Burger, a specialist in the treatment of cancer and blood diseases, who testified for the defendant, corroborated Dr. Mattern's trial testimony on the causal relations between the cancer, the infection, and the death.

The only evidence that the cancer and chemotherapy were not contributing causes is found in a "Statement of the Attending Physician," submitted by Dr. Mattern to the defendant. But even that is qualified by the doctor's letter stating that the low white blood count might have contributed to the death, and his hospital summary showing complications from the lung cancer related directly to the death. On the whole, there was no substantial evidence of the accident's having caused the death directly and independently of all other causes.

Despite the lack of substantial evidence suggesting that Michael Gay's death resulted directly from his accident, "independently of all other causes," under the law of some jurisdictions Cheryl Gay might have a right to recover under the policy. For example, in *Fetter v. Fidelity & Casualty Co. of N.Y.* 174 Mo. 256, 73 S.W. 592 (1903), the Supreme Court of Missouri construed similar language in an accident insurance policy covering a man who died from an accidental rupture of a kidney. The defendant insurance company contended that although the kidney was ruptured by an accidental injury, it would not have been ruptured were it not already affected by a pre-existing cancer. The Court characterized the causes referred to in the policy as proximate or direct, not remote, and held that a pre-existing disease does not release an insurer when the accident is found to be the direct proximate cause of injury. And in *DeBlieux v. Travelers Insurance Co.*, 185 La. 620, 170 So. 14 (1936), the Court was faced with a similar limitation in the insurance coverage of a man who died of septicemia and whose pre-existing leukemia increased his vulnerability to infection, much like the case at hand. While there was evidence in *DeBlieux* that even a normal person would have died from septicemia, possibly for the reason that modern antibiotics were not then known, because it concluded that the insured died only of septicemia and not of the leukemia, the Supreme Court of Louisiana affirmed a verdict for the beneficiary despite the fact of the decedent's leukemia and its contributory role in producing death.

The trial court in this case, however, was bound to apply Virginia law, which it correctly did. Although we are unable to find that the Supreme Court of Virginia has decided a case on facts so similar as to bind us, it has addressed itself to the question in not dissimilar fact situations. In *Mutual Benefit Health & Accident Ass'n v. Ryder*, 166 Va. 446, 185 S.E. 894 (1936), the Court, in holding that death from septicemia uncomplicated by pre-existing disease was an injury "resulting directly and independently of all other causes," id. at 449, 185 S.E. at 895, reasoned that "if an accident co-operates with some pre-existing disease or bodily infirmity and produced results which but for them it would not have produced, there is no liability." Id. at 453, 185 S.E. at 897. The Court in *Ryder*, quoting from *Masonic*

*Accident Ass'n v. Shryock,* 73 F. 774, 775–76 (8th Cir.1896), which it described as probably the leading case on the subject, elaborated on this principle:

[I]f [the insured] sustained an accident, but at the time it occurred he was suffering from a pre-existing disease or bodily infirmity, and if the accident would not have caused his death if he had not been affected with the disease or infirmity, but he died because the accident aggravated the effects of the disease, or the disease aggravated the effects of the accident, the express contract was that the association should not be liable for the amount of this insurance.

And it cited several jurisdictions, including Virginia, which had applied that principle or cited *Shryock* with approval. Id. 166 Va. at 454–55, 185 S.E. at 898. See also *Crowder v. General Accident, Fire & Life Assurance Corp.,* 180 Va. 117, 121, 21 S.E.2d 772, 774 (1942), which applied the principle we have quoted from *Ryder* to hold that when a condition caused by pre-existing injury was aggravated by a later injury then there could be no recovery for the present disability could not be said to have been caused "independently and exclusively of all other causes."

In *Tanner v. The Life Ins. Co. of Va.,* 217 Va. 218, 227 S.E.2d 693 (1976), the court construed the language of an accidental death provision of a life insurance policy much like the language of the policy before us. The policy insured against death sustained as a direct result of accidental bodily injury, "independently and exclusively of all other causes. . . ." Id. 219, 227 S.E.2d at 694. The insured, who suffered from pre-existing arteriosclerosis, died from a coronary occlusion soon after physically subduing a patient at the hospital where he worked. Id. at 329, 227 S.E.2d at 694. The trial court found that death resulted at least indirectly and partially from the pre-existing disease. Id. at 328, 227 S.E.2d at 693. The Supreme Court affirmed and held that on the principles announced in *Ryder* and *Crowder, supra,* the insurer was entitled to judgment because the sudden physical exertion cooperated with the pre-existing disease to cause the death, which the physical exertion alone would not have caused. Id. at 220–21, 227 S.E.2d at 694–95.

The plaintiff, however, contends that *Tanner* is not persuasive because the pre-existing heart disease of the decedent in that case contributed directly to produce death, where in this case the decedent's leukopenia and vena cava syndrome were passive causes that merely served to permit the septicemia to kill. We do not think that the courts of Virginia would find this distinction. In *Ryder,* 166 Va. at 453, 185 S.E. at 897, the Court viewed causation in terms of whether, but for the non-covered risk, the accident would have produced the result. In *Crowder, supra,* the Court described causation alternatively in terms of proximate cause or substantial contribution. We do not believe that the distinction between the modes of causation, pointed out by the plaintiff, makes a difference in the operation of the contract language under the conception of causation found in Virginia law. See generally 22 J. Appleman, *Insurance Law & Practice* §§ 12892, 12892 (rev. ed. 1979); Annot., 84 A.L.R.2d 176 (1962).

Because Virginia law recognizes and gives literal effect to the policy language that limits coverage, the trial court was bound to set aside the plaintiff's verdict for compensatory damages.

The trial court also granted judgment notwithstanding the verdict on the issue of punitive damages because it found a complete absence of malice or bad faith on the part of the defendant in its handling of the claim. See *Wright v. Everett,* 197 Va. 608, 615, 90 S.E.2d 855, 860 (1956). We need not consider the sufficiency of the evidence to support the award of punitive damages, however, because compensatory damages are a necessary predicate in Virginia in such cases for an award of punitive damages. The predicate is lacking here. *Zedd v. Jenkins,* 194 Va. 704, 706, 74 S.E.2d 791, 793 (1953).

The judgment appealed from is accordingly

AFFIRMED.