*725
 
 HAMLIN, Justice.
 

 This is an appeal
 
 [1]
 
 from a judgment of the trial court awarding plaintiff total disability recovery of $200 per month, commencing May 12, 1952, and extending as long as disability exists, under the coverage of Policy No. 1272142 executed between plaintiff and Pacific Mutual Life Insurance Company, appellant, dated February 6, 1951; ordering a refund to plaintiff of all premiums paid subsequent to May 12, 1951; waiving payments of future premiums and decreeing the policy in force throughout the period of disability; and, providing for the payment of interest on the amounts due at the time of judicial demand and those falling due thereafter.
 

 On May 12, 1951, plaintiff, a rice farmer, was endeavoring to unload a barrel of oil from his truck in order to refuel the pump employed for watering his crop, when the bed of the truck broke, precipitating the fall of plaintiff and the barrel to the ground. Plaintiff was rendered unconscious for approximately an hour, and upon regaining consciousness he experienced a burning pain over his entire back. He immediately drove to Kaplan, Louisiana, and consulted Dr. Edward R. Villemez, who administered a light treatment and plastered his back. Plaintiff then reported the accident to Mr. Dennis Simon, defendant’s agent, showing him the condition of the truck. Plaintiff was unable to work, and for approximately five weeks he received light treatments from Dr. Villemez. Pain was diminished, but on September 13, 1951, acuteness returned and he consulted Dr. Derwin K. Harmon of Kaplan, Louisiana, who found muscle spasm and severe pain in plaintiff’s back. Treatment by this doctor did not diminish pain and disability to work, and he sent plaintiff to Dr. James Gilly, an orthopedic surgeon of Lafayette, Louisiana. This doctor found that back muscle attachments that hold and stabilize the bone structure had been injured, and that the breeching of the traumatized area caused the condition of pain. He found disability and restriction of motion in plaintiff’s spine. Study of X-rays revealed that plaintiff had a condition of congenital spondylolisthesis.
 
 [2]
 
 Treatment was administered, but plaintiff experienced inability to get out of bed
 
 in
 
 the morning and disability to pursue his former occupation.
 

 
 *727
 
 Under Policy No. 1272142, Pacific Mutual Life Insurance Company paid to plaintiff a total of $1,600, represented by six checks — one in the amount of $600 on December 20, 1951, and five in the amount of $200 each on January 18, 1952, March 18, 1952, March 26, 1952, April 22, 1952, and May 19, 1952, respectively — bearing the notations, “on account of sickness” and “disability date, September 13, 1951.”
 

 On May 30, 1953, plaintiff filed suit on the policy herein for total disability of $200 per month from May 12, 1952, until his death, plus penalties and attorney’s fees. Defendant answered, generally denying the allegations of plaintiff’s petition which alleged his grounds for recovery. At the termination of evidence the matter was submitted without brief or oral argument, and judgment was rendered as above set forth.
 

 In this Court, defendant contends (1) that the loss plaintiff suffered did not result both “directly and independently of all other causes from bodily injuries accidently sustained while the policy was in force”; (2) that a congenital condition (which constituted an infirmity) precluded recovery of total disability by virtue of the reductions clause of the policy which disallows accidental benefits if the disability was contributed to “by bodily infirmity”; (3) that plaintiff was not disabled within the meaning of the accident coverage clause of the policy; and, (4) that no further refund of premiums was due.
 

 The pertinent provisions of the instant policy (a combination life, family income, and disability) read:
 

 “Policy Number 1272142
 

 “Hereby Insures Dalton Joseph Thibodeaux, (herein called Insured),
 

 “Occupation (Class C) Farmer
 

 in the sum of $200.00 per month, (herein called Monthly Indemnity) against loss, as hereinafter specified, resulting directly and independently of all other causes from bodily injuries accidentally sustained while this Policy is in force (herein called such injuries) ; and against loss, as hereinafter specified, caused by sickness (or disease) contracted after the date hereof and while this Policy is in force (herein called such sickness) ; subject to the provisions, conditions and limitations as follows :
 

 “Consideration $120.00 is the premium for the term of 12 months to commence February 6, 1951
 

 
 *729
 
 “Sickness Benefit
 

 Total Disability-“If while this Policy is in force and by reason of such sickness, the Insured shall be wholly, necessarily and continuously disabled and prevented from performing every duty pertaining to his occupation and if while so disabled the Insured shall be regularly attended by a legally qualified physician or surgeon other than himself, the Company will pay Monthly Indemnity for the period, beginning with the first day of such disability and not exceeding twelve months, throughout which such disability and treatment shall continue.
 

 “Accident Benefits
 

 Total Disability “(a) If such injuries shall, commencing within twenty days after the date of accident and continuously thereafter, wholly disable the Insured and prevent him from performing every duty pertaining to his occupation, the Company will pay Monthly Indemnity for the period, beginning with the first day, of such continuous total disability, but for not exceeding twelve consecutive months. After the payment of Monthly Indemnity for twelve months as aforesaid the Company will continue the payment of Monthly Indemnity thereafter as long as the Insured shall be wholly and continuously disabled and prevented by such injuries from engaging in any occupation or employment for wage or profit.
 

 *********
 

 “Reductions
 

 “A. Accident indemnity under this Policy is not payable for any loss which results from or is contributed to by (a) sickness or bodily or mental infirmity, (b) bacterial infection, including infectious disease, unless the infection shall occur with and through a cut or wound accidentally sustained, (c) bodily injury which consists of inguinal hernia, or (d) medical, dental or surgical treatment except for injuries covered by this Policy. Any loss which results from or is contributed to as in this provision A specified shall be deemed to result from sickness and shall be covered only as provided under the Sickness Benefit provision of this Policy. “B. Accident indemnity and sickness indemnity provided Under this Policy will not both be paid for any one period of disability.”
 

 
 *731
 
 The testimony of record is to the effect gaged in rice farming, having performed that prior to his accident, plaintiff was en-this type of work from the time he was twelve years of age. He not only had complete supervision of approximately 260 acres, but he performed a great part of the physical work, which embraced the operation of tractors and other implements of farming, the digging of ditches with shovels, the harvesting of rice seeds, the lifting and sewing of bags of rice weighing over 160 pounds, and the driving of trucks. Seven lay witnesses and plaintiff’s father affirmed this fact. Only spasmodically — especially during harvesting time — did plaintiff employ farm workers to assist him. A number of lay witnesses testified that plaintiff performed no physical work after the accident, hiring them to do the work he had previously performed himself. Plaintiff completed a high school education; he was twenty-seven years of age at the time of the accident being a vigorous, robust male of medium stature and weight.
 

 The record conclusively discloses that up to the time of his accident, plaintiff had neither suffered nor experienced any impairment of activity. Only after the fall was his condition rendered such that he became disabled.
 

 The medical testimony of record, based on X-rays taken after the accident, is that, in addition to the injury suffered, plaintiff had either developmental or congenital condition of spondylolisthesis, bilateral isthmus, and spina bifida occulta. Dr. Blaise Salatich, who examined plaintiff after he had filed the instant suit, explained this condition as follows:
 

 “Radiographic sttrvey of the lumbosacral spine demonstrated a bilateral isthmus defect between the fifth lumbar and first sacral vertebrae, including a spondylolisthesis of one degree in the recumbent position with increase in degree in the erect weight bearing attitude. This pre-existing developmental defect of the lumbosacral region was considered to have been asymptomatic with no significant restriction of physical activities or complaints' in view of this individual’s occupation as a farmer prior to the trauma exerted on his lower trunk and back in May 1951, with this superimposed traumatic insult resulting in injury of the ligamentous and musculofascial structures adjacent to this articulation, rendering this pre-existing entity sufficiently symptomatic to require restriction of imposing physical activities and resulting in significant low back pain.
 

 “The spina bifida occulta is the lack of fusion, in layman’s terms. When the body develops, there is a fusion of .both halves of the vertebrae; with the posterior portion or the spinous process which one knows as little knobs in the
 
 *733
 
 back or'backbone.
 
 They
 
 fuse together and the spina bifida occulta is a lack of fusion of the spinous processes in the midline. In comparison with an isthmus defect, the isthmus defect as described in this case is one where the bone between the front part of the vertebra and the back part of the vertebra is abnormally developed, which allows the front part of the vertebra to slide forward out of normal relationship.”
 

 From the testimony of record, we deduce that the injury sustained by plaintiff was a torsion-type low back injury, involving ligamentous and musculofascial structures. There was force exerted on plaintiff’s lower trunk by the sudden falling and turning over of a heavy drum of oil. The injury was accompanied by complete disability to pursue his former occupation, dysfunction, and pain, and the pre-existing condition became symptomatic.
 

 “In accident insurance the question whether the insurer is liable for an injury depends on the proximate cause of the loss.' The term ‘proximate cause,’ as here used, means the same as in other cases, and a provision requiring loss to be caused by accident ’‘independent of all other causes’ is equivalent to a provision requiring it to be the proximate cause.” ' 29 Am.Jur., Sec. 932, “Insurance,” p. 707.
 

 In the case of Frerichs v. London & Lancashire Indemnity Co. of America, 169 La. 182,
 
 124
 
 So. 821, 822, this Court determined that death was not caused by accidental means, but it made the following pertinent statement.
 

 “The insurance, as we have said, was ‘against loss [meaning death or disability] caused by bodily injuries effected directly and independently of all other causes through accidental means.’ The company, therefore, is not liable in this case unless the bodily injury which caused death was effected directly by accidental means, and independently of the arteriosclerosis which the insured was afflicted with. * * * ”
 

 In Carnelious v. Louisiana Industrial Life Ins. Co., 138 So. 533, the Court held:
 

 “ * *■ * But the argument is made that, if it had anything whatever to do with the situation, no recovery can 'be had because the accident must be the solé and independent cause of the disability. Our understanding of the meaning of this clause, as interpreted by the courts generally, is that it suffices if the cause of injury or death be the efficient or predominant cause. * * *” See, De Blieux v. Travelers Ins. Co., 185 La. 620, 170 So. 14, 17.
 

 “Does the provision of the policy ‘the effects resulting directly and exclusively of all other causes from bodily in
 
 *735
 
 jury sustained during the life of this policy solely through accidental means’ mean that there can be no recovery if there is a latent or dormant disease which becomes active through the agency of the accident, and co-operates with the other effects of the accident in bringing about death?
 

 “We think that, if the accident is the proximate cause of the death and sets in motion or starts a latent or dormant disease, and such disease merely contributes to the death after being so precipitated by the accident, it is not a proximate cause of the death nor a contributing cause within the meaning of the terms of the policy.” United States Fidelity & Guaranty Co. v. Hood, 124 Miss. 548, 87 So. 115, 119, 15 A.L.R. 605. See, also, New York Life Insurance Company v. McGehee, 5 Cir., 260 F.2d 768.
 

 We conclude that the injury which plaintiff suffered was the cause of his loss. It was effected by accidental means — the giving way of the bed of the truck and the resulting fall. The injury was independent of plaintiff’s pre-existing condition, which was awakened by the occurrence.
 

 A review of authorities convinces us that where an insured has a dormant condition and such condition is awakened by accident, the condition is not deemed the cause of the'disability or loss which the insured suffers. LaBarge v. United Insurance Company, 209 Or. 282, 303 P.2d 498, 306 P.2d 380; Scanlan v. Metropolitan Life Ins. Co., 7 Cir., 93 F.2d 942; Kilgore v. Reserve Life Insurance Company, 231 S.C. 111, 97 S.E.2d 392.; Underwriters At Lloyd’s, London, England v. Lyons, 9 Cir., 248 F.2d 149; Schonberg v. New York Life Ins. Co., 235 La. 461, 104 So.2d 171.
 

 The “Reductions” clause of the policy, supra, provides that accident indemnity is not payable for any loss which results from or is contributed to by sickness or bodily or mental infirmity. Defendant argues that plaintiff’s pre-existing condition, principally spondylolisthesis, was an infirmity which contributed to the loss.
 

 “It must be remembered that a contract of insurance is prepared by the insurance company, and that the company contracts through its agents with ordinary laymen who do not know the technical meaning of medical words and phrases. No doubt this is one of the reasons why the courts in construing the meaning of medical words and phrases found in health, accident, and sickness policies have consistently said that such words and phrases should be understood in their plain, ordinary, and popular sense rather than in their scientific sense. * * * ” Seguin v. Continental Service Life & Health Ins. Co., 230 La. 533, 89 So.2d 113, 115, 55
 
 *737
 
 A.L.R.2d 1014. See, Schonberg v. New York Life Insurance Company, 235 La. 461, 104 So.2d 171, 177.
 

 Webster’s New World Dictionary of the American Language, College Edition, defines “Infirmity” as follows:
 

 “The quality or state of being infirm; feebleness; weakness.”
 

 In determining whether ' plaintiff’s preexisting developmental or congenital condition might be classed as an infirmity, the following testimony
 
 [3]
 
 of Dr. Gilly on redirect examination is pertinent:
 

 “Q. Doctor, you probably have gathered by now that the defendant insurance company is attaching quite a great deal of significance to descriptive words that have been used in describing his condition. With that in mind I would like to question you along the lines as has been pursued by the attorney for the defendant, specifically about this matter: Actually, Doctor, the condition of spondylolisthesis is really nothing but a
 
 pecularity
 
 of the bone structure, isn’t it? A. Yes, sir.
 

 “Q. Not a disease? A. Not a disease, no.
 

 “Q. Now, one might be safe in saying that there are a great many people who live entirely normal and healthy lives and who may have the same type of
 
 pecularity
 
 of the bone structure? A. That is probably true in individual cases. I do not know the figures on a certain number of patients with back conditions who will become or will not become symptomatic.
 

 ******
 

 “Q. Like any other bone — Let’s put it this way. In other words, you have a condition there that doesn’t bother you, you are otherwise sound? A. That is true.
 

 “Q. Now, for example, this particular man, if he had been engaged in farming operations, heavy labor, since he was ten years old, never had any difficulty or back condition, would you consider him a physically sound person? A. In the absence of x-ray findings, yes, sir.
 

 ******
 

 “Q. So actually the primary cause of disability is the injury to the surrounding tissues and muscle attachments? A. The primary cause of the disability with probably the sprain sustained. The primary cause of prolonging the condition was spondylolisthesis.
 

 “Q. Which is not a disease by any definition of the word ? A. Personally
 
 *739
 
 I consider a disease something with a specific cause; such as diphtheria, lockjaw or what have you.”
 

 Dr. Salatich stated that the word “infirmity” was not contained in the medical dictionary. He considered spondylolisthesis a mechanical abnormality. He stated that plaintiff was not chronically or mentally afflicted, as he knew the term “infirmity.” “ * * * so he could not be considered, according to my standards of comparison, afflicted or presenting any infirmity.” He further testified:
 

 “A structural defect contributes to some degree but I .am not of the opinion that the structural defect in itself contributes to this man’s residual disability. I think the ligamentous and musculo-fascial injury adjacent to the lumbosacral articulation is of sufficient severity to warrant the same degree of residual disability as to permanency and severity, in spite of the existing spondylolisthesis. In other words, in cases in the past, by past experience, men who have been exposed to a type of trauma similar to this case, with resulting clinical findings, with resulting residual disability, with no spondylolisthesis.”
 

 Dr. Derwin K. Harmon testified that spondylolisthesis
 
 [4]
 
 is not a disease, and that if the person — previous to the injury — had no pain, it was not an impairing condition. His definition of the condition was that it was a peculiarity of the bone structure. He stated that where one has an anatomical or peculiarity of the bone structure, the body more or less adjusts to it.
 

 Dr. E.'R: Villemez, who examined plaintiff shortly after the accident and found that he had a low back injury, testified that he would classify the pre-existing condition of plaintiff, revealed by X-ray, as a malformation or congenital abnormality. He stated that one may have such a condifion without any impairment of physical agility. He testified:
 

 “Q. Therefore, an affliction connotes in lay terms some type physical impairment, disease or sickness ? A. Same thing, yes, sir. Take the knock-knee for instance, that is why I think it better to express it as a congenital abnormality instead of an affliction.”
 

 We have not been able to find in our Louisiana jurisprudence a thorough discussion of a “Reductions Clause”, as is herein involved; the jurisprudence of other jurisdictions, however, is replete.
 

 
 *741
 
 The landmark case of Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914, where Justice Cardozo was the organ of the court, involved a policy similar to the instant one. The insured, while lifting a milk can into an ice box, slipped and fell, the can striking him on the abdomen and causing such pain that he was unable to get up. Operation revealed a duodenal ulcer, about the size of a pea, which had been unknown to the insured. He later died from peritonitis. The court stated:
 

 “We think the evidence sustains a finding that the ulcer was not a disease or an infirmity within the meaning of the policy. Left to itself, it would have been as harmless as a pimple or a tiny scratch. Only in the event that it was progressive would it become a source of pain or trouble. If dormant, as it was found to be, it was not only harmless in itself, but incapable of becoming harmful except through catastrophic causes, not commonly to be expected. In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Somthing more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men. Eastern Dist. Piece Dye Works, v. Travelers’ Ins. Co., 234 N.Y. 441, 453, 138 N.E. 401, 26 A.L.R. 1505. ‘Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract.’ Bird v. St. Paul Fire & Marine Ins. Co., 224 N.Y. 47, 51, 120 N.E. 86, 87, 13 A.L.R. 875; Goldstein v. Standard Accident Ins. Co., 236 N.Y. 178, 183, 140 N.E. 235, 236; Van Vechten v. American Eagle Fire Ins. Co., 239 N.Y. 303, 146 N.E. 432, 38 A.L.R. 1115. A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules.
 

 “A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency. * * *
 

 “An ulcer as; trivial and benign as an uninfected pimple is at most a tendency to an infirmity, and not an infirmity itself.
 

 
 *743
 
 “Any different construction would reduce the policy and its coverage
 
 to
 
 contradiction and absurdity. * * * ” See, also, Leland v. Order of United Commercial Travelers of America, 233 Mass. 558, 124 N.E. 517; Jefferson Life & Casualty Co. v. Bevill, Alabama, 38 Ala.App. 384, 86 So.2d 289; Brown v. U. S. Fidelity & Guaranty Co.,
 
 336
 
 Mass. 609, 147 N.E.2d 160; Braddock v. Pacific Woodmen Life Association, 89 Utah 75, 54 P.2d 1189, 1194.
 

 In Mutual Life Ins. Co. of New York v. Dodge, 4 Cir., 11 F.2d 486, 489, 59 A.L.R. 1290, the court stated:
 

 “ * * * The words ‘bodily infirmity or disease’ are frequently used in policies of insurance and have a well understood meaning. They are construed to be practically synonymous, and to refer only to an ailment or disease of a settled character. 1 C.J. 452; Cooley’s Briefs on Law of Insurance, vol. 4, p. 3198; Meyer v. Fidelity, etc., Co., 96 Iowa 478, 65 N.W. 328, 59 Am.St.Rep. 374; Manufactures Accident Indemnity Co. v. Dorgan, 6 Cir., 58 F. 945, 7 C.C.A. 581, 22 L.R.A. 620. It is true that in the cases in which these words have been defined the point involved has usually been whether they would cover a temporary ailment as distinguished from one of a permanent nature; but the definitions given them negative the idea that they could possibly include a personal peculiarity, not in any wise impairing bodily health or strength, and not in any way interfering with the functioning of the organs of the body. As said by the Circuit Court of Appeals of the Third Circuit: ‘An infirmity of the body, as the term implies, is something that materially impairs the bodily powers.’ Black v. Travelers’ Ins. Co., 3 Cir., 121 F. 732, 58 C.C.A. 14, 61 L.R.A. 500.” See, also, 29 Am.Jur. Secs. 995 and 996. “Insurance,” p. 747; Cf. Graves v. Penn Mutual Life Ins. Co., 2 Cir., 227 F.2d 445.
 

 Considering the medical and lay evidence as to the physical condition of plaintiff before the injury and the fact that he had performed farm work of a laborious nature for approximately fifteen years without any difficulty or pain, we cannot hold that at the time of the occurrence — accident herein involved — his physical condition was such that he had any infirmity which in the absence of trauma contributed to his present physical condition.
 

 Plaintiff’s life, traced supra, is conclusive evidence of the fact that if he did have any congenital or developmental condition or abnormality, if was of such a slight or dormant nature as to have virtually no significance. Scanlan v. Metropolitan Life Ins. Co.,
 
 7
 
 Cir., 93 F.2d 942, 946.
 

 
 *745
 
 The medical examination required before defendant issued the instant policy was passed by plaintiff with no rating nor requirement of additional premiums. No false representations were made. Plaintiff paid the premiums due to and charged by the defendant in consideration of its issuance of the policy. He went about his business and affairs in the even tenor of his ways until he suffered his injury.
 

 The above are all circumstances which the court is bound to consider in a case of this kind as being favorable to plaintiff.
 

 We conclude that plaintiff was disabled within the meaning of the accident coverage clause of the policy and is entitled to total disability as set forth in the provisions of the policy.
 

 Plaintiff has answered the appeal, asking that the judgment of the trial court be reversed, insofar as it did not allow penalties and attorney’s fees. LSA-R.S. 22:657.
 

 A study of the highly scientific questions herein involved and the surrounding facts and circumstances of this case convinces us that the defendant was not arbitrary and capricious in its refusal to pay plaintiff total disability benefits. The trial judge correctly stated:
 

 “It is not felt that the defendant was unreasonable in refusing payments in this case and thus the claim for penalties is rejected. In matters involving close questions of fact, such as are here presented, on a highly scientific question of physical disability, it is not unreasonable for the defendant to seek a judicial determination thereof before paying.”
 

 The judgment of the trial court ordered a refund to plaintiff of all premiums paid subsequent to May 12, 1951, the date of the accident. Article VIII of defendant’s answer avers that it refunded to plaintiff premiums paid by him on the life policy during the period from October 6, 1951 to June 6, 1952, in the sum of $245.70. The evidence of record shows that such a check was issued to plaintiff on August 4, 1952.
 

 For the reasons assigned, the judgment of the trial court is amended so as to allow defendant a credit of $245.70, the amount of the refund of premiums. In all other respects, the judgment of the trial court is affirmed. All costs are to be paid by defendant.
 

 [1]
 

 . Previously, defendant’s appeal to this Court was dismissed. 231 La. 617, 92 So.2d 385. Defendant’s subsequent appeal to the Court of Appeal, First Circuit, was transferred to this Court. 95 So.2d 183. Plaintiff’s motion to dismiss the appeal was denied by this Court. 233 La. 804, 98 So.2d 195.
 

 [2]
 

 . Dr. Gilly defined congenital spondylolisthesis as: “ * * * a defect in the function or joining of the back part of the vertebra to the front part. This is not necessarily hereditary, but it is usually present at birth and represents the failure of the separate, or ossification, or separate bone forming of the vertebra to form a joined vertebra in that the vertebra exists in separate front segments or anterior and posterior segments.”
 

 [3]
 

 . There is other testimony of Dr. Gilly, which apparently does not substantiate this testimony, but we believe that the quoted testimony sets forth what he really believed and the meaning he intended to convey.
 

 [4]
 

 . “It is not necessarily slipping forward. It is a forward misplacement that is formed that way. 'Yon can interpret the vertebra as just boxes one on top of the other and they are held to both by ligaments. In spondylolisthesis one of these boxes is pushed forward on the other and the reason it is is because the thing that holds it to the litigaments in the back is longer in that vertebra than the other. It is not actually it is pulled forward and stays there, it is not a thing that pulls forward and backward.”