170 So.2d 646 (1965)
247 La. 263
Dr. Walter S. HARMON
v.
LUMBERMENS MUTUAL CASUALTY COMPANY.
No. 47358.
Supreme Court of Louisiana.
January 18, 1965.
Bodenheimer, Looney & Jones, Shreveport, Hammett, Leake & Hammett, New Orleans, for defendant, appellant and applicant.
*647 Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for respondent.
Burton, Roberts & Ward, Baton Rouge, for amicus curiae.
HAMLIN, Justice:
In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, La. Const. of 1921 L.S.A.) we directed Certiorari to the Court of Appeal, Second Circuit, in order that we might review that part of its judgment in the instant matter which awarded plaintiff penalties in the sum of $50,000.00 and attorney's fees in the sum of $20,000.00, together with 5% interest from judicial demand.[1] The Court of Appeal amended the judgment of the trial court by allowing penalties and attorney's fees; it affirmed the judgment of the trial court insofar as it awarded plaintiff $50,000.00 for loss of use of his hand.[2]
On July 31, 1958, Walter S. Harmon, M.D., sixty-six years of age, a fellow in and an active member of the American College of Surgeons, became an insured under specific loss indemnity group insurance policy No. P 12 293, issued by Lumbermens Mutual Casualty Company only to qualified fellows in the American College of Surgeons. His specific loss accident indemnity was $100,000.00. He named the Trust Department of the First National Bank, Shreveport, Louisiana, as owner of the policy, Serial Number 01903, Plan B, and stated that the insurable interest of the owner was that of "Trustee."
Effective August 1, 1958, an amendment rider providing the following additional benefits at no increase in premium was added to the policy:

"1. Loss of two or more fingers of one hand --- 25% of Principal Sum
"2. Loss of thumb and one or more fingers
 of one hand ------------------------------ 25% of Principal Sum
"3. Loss of use of hand ----------------------- 50% of Principal Sum"

The amendment rider provided:
"B. Accidental Loss of Use of Hand. When injury to either or both hands caused solely by an accident occurring while the Policy is in force as to the Insured shall, directly and independently of all other causes, result within twenty days after the date of the accident in the complete loss of use of either or both hands and prevent the Insured from performing any and all duties of his profession for a period of twelve consecutive months, such injury shall then be considered as resulting in the permanent loss of use of either or both hands and the Company will pay Fifty Percent of the Specific Loss Accident Indemnity stated in the Schedule.
"* * *"
While on a hunting trip on October 29, 1960, Dr. Harmon climbed through a fence and dropped his gun; he caught it by the barrel, at which time it discharged. Three fingers of his left hand were mangled and were later amputated through the proximal phalanges below the metacarpal phalangeal joint. As a result, Dr. Harmon is incapacitated from performing surgery of any consequence.
In submitting proof of loss to defendant on November 20, 1960, Dr. Harmon stated *648 that he was "disabled" on that date and that the time of his return to work was "unknown." He gave the following authorization for medical records and reports:
"I hereby request and authorize any hospital, physician or other person who has attended or examined me, or who may hereafter attend or examine me, to disclose any and all information obtained thereby."
On May 12, 1961, defendant's Group Claim Department addressed the following letter to plaintiff:
"Our file is now sufficiently complete to permit us to make a decision relative to the claim you submitted as a result of the injury to your hand.
"We regret the evidence in file does not permit favorable consideration of your claim under either the provision covering amputation of two or more fingers of one hand or that covering accidental loss of use of the hand."
On May 25, 1961, plaintiff's attorney requested that defendant furnish his firm with a detailed and accurate statement as to the basis on which Dr. Harmon's claim had been denied; this was for the purpose of advising Dr. Harmon as to the correctness of defendant's denial. On May 29, 1961, defendant answered as follows:
"The policy provides that the injuries sustained must result within twenty days after date of the accident in the complete loss of use of the hand and prevent the insured from performing any and all duties of his profession for a period of twelve consecutive months. Although Dr. Harmon has obviously sustained a severe injury to his hand, the information we have in file indicates the policy requirements for loss of use of the hand have not been met."
Plaintiff filed suit on June 5, 1961, alleging that he did not know on what grounds defendant denied liability; he asserted that defendant's position was unwarranted and insupportable. He further alleged that there had never been just and reasonable grounds (which would put a reasonable and prudent business man on his guard) to justify defendant's refusal of his claim. Plaintiff prayed for double the amount allegedly due him (pursuant to the provisions of LSA-R.S. 22:657) and attorney's fees in the amount of $20,000.00.
In answer, defendant averred in part:
"* * * Appearer shows that petitioner did not sustain the loss of the use of his left hand which caused petitioner directly and independently of all other causes to be unable to perform any and all duties of his profession.
"Appearer affirmatively alleges that petitioner's inability to perform surgery is the result of a heart attack rather than the accident and injury upon which this suit is based.
"Appearer further affirmatively shows that at the time the accident involved allegedly occurred that petitioner was the administrator of the Confederate Memorial Hospital and, at that time, was charged primarily with administrative duties which he continued to exercise subsequent to the accident and, therefore, the said accident did not prevent him from performing the duties of his profession."
The evidence elicited at the trial reflected that plaintiff suffered a heart attack during April, 1959, and was hospitalized from April 21st to May 16th, 1959; that he was hospitalized for a second attack from May 27th to June 6th, 1959; that he suffered a third attack during October, 1959, and was hospitalized until the end of that month.
Plaintiff answered interrogatories propounded to him before trial to the effect that he had performed no operations from January 1, 1960, to date, April 21, 1962, and *649 that he had received no income from surgical activities during 1960. He answered further interrogatories to the effect that he had no income from surgery during 1960 and approximately $10,000.00 from surgery during 1959. His testimony on trial was somewhat in conflict with his responses to the interrogatories. He stated that he had performed hernia operations and appendectomies at the Physicians and Surgeons Hospital. Defendant introduced in evidence a letter from Willis-Knighton Memorial Hospital, Inc., dated February 22, 1961, in which the Medical Record Librarian stated that the Physicians' Index indicated that Dr. Harmon had not treated any patients in the hospital from January 1, 1960, to the date of the letter. Defendant also introduced in evidence a letter from the T. E. Schumpert Memorial Sanitarium stating that Dr. Harmon had not admitted a patient to the hospital for the years of 1960 and 1961 to date, February 22, 1961. Plaintiff testified that as Administrator of Confederate Memorial Hospital, he could not perform surgery at that hospital.
Plaintiff's physician, Dr. William M. Hall, a specialist in cardiology and internal medicine, was called by plaintiff as a witness; he affirmatively testified that between the time of plaintiff's last heart attack and the time of his accident, it was his opinion that Dr. Harmon could not perform major surgery. Pertinent testimony is as follows:
"Q. And as a matter of fact, you did not, at that time, instruct him that it would be permissible for him to perform major surgery, did you?
"A. No, sir.
"Q. On the contrary, it was still your instructions to him that he was not to engage in strenuous activity and not to engage in major surgery?
"A. Yes, sir.
"Q. As a matter of fact, it was inherent in his condition that he was not of physical capability to perform major surgery?
"A. Yes, sir.
* * * * * *
"Q. * * * Now, that condition continued right on through 1960 up until October of 1960, did it not?
"A. Yes, sir. He was still having pains then.
"Q. As a matter of fact, going back now to June, 1959 when he had his first attack, right on up through October of 1960, there had been no change in your instructions to him; he was specifically instructed not to perform major surgery?
"A. Well, I am not certain about the specific wording of it every time, but it was the understanding that that was too much.
* * * * * *
"Q. * * * Then you saw him on August 2nd, 1960, and on August 6th, 1960 and September 16th, 1960 he was seen by Dr. Hargrove and his condition was just about like it had been?
"A. Yes, sir.
"Q. No improvement; almost static?
"A. Yes, sir.
"Q. Actually, on October 14th, 1960, Dr. Hargrove made another note that he was having more attacks of pain.
"A. That is right.
"Q. A heaviness under the chest bone.
"A. Yes, sir.
"Q. And that indicated coronary insufficiency to you, did it not?
"A. Yes, sir."
*650 The trial judge states in his reasons for judgment that the defendant predicated its defense on information from Dr. Hall. Dr. Sam Nadler of New Orleans, a specialist in internal medicine, said field covering cardiovascular disease, appeared as a witness for defendant; he testified that it would have been foolhardy on the part of Dr. Harmon to practice major surgery and that such practice would be a hazard to the patient.
At the time of trial, plaintiff's recovery from his heart condition had been great; in fact, he had made a trip to the Far East in 1961 and had gone lion hunting in Africa during the early part of 1963.
The trial court found from the testimony of record that plaintiff could have carried on the duties of his profession prior to the hunting accident; it was convinced from the testimony of Dr. Harold R. Bicknell, an orthopedic surgeon who treated plaintiff for his gunshot wound, that plaintiff was not capable of performing surgery after the accident.
As stated supra, the trial court awarded plaintiff $50,000.00 but denied penalties and attorney's fees. It stated, "* * * and defendant having predicated its defense on this information [Dr. Hall] we do not think it arbitrary and capricious in refusing to pay the benefits under the policy. Furthermore, we have not been cited a case where a court has passed upon this specific point (Issue No. 1) before, and therefore, the answer to Issue No. 3 is `No.'"[3]
The Court of Appeal found that none of the stipulations of the policy relative to termination had occurred prior to the accident.[4] It also found that the policy was prepared by the insurance company and presumably a premium commensurate with the type risk involved was charged and paid; it still further found that the insurance company was charged with knowledge of its own policy and the legal meaning of its provisions. The Court of Appeal held that the policy must be construed under and governed by the laws of Louisiana. In interpreting the policy, said Court stated: "Our view is that the clause `Accidental Loss of Use of Hand' plainly sets forth the coverage intended under the quoted provision of the policy; that such loss of use must be directly and independently caused by the accident; and that the second portion of the provision applies to a determination of the permanence of the injury. Certainly the loss of use of his hand is conceded by all to be an injury such as would prevent the policyholder from practicing surgery for a period of twelve consecutive months. Therefore, under the policy such injury shall then be considered as resulting in the permanent loss of use of either or both hands for which the company states it will pay fifty percent of the Specific Loss Accident Indemnity stated in the schedule, which is conceded to be the sum of $50,000." The Court of Appeal then considered the application of the penalty provisions of LSA-R.S. 22:657 to defendant's refusal to pay plaintiff within the time limits of the statute and held, "In the light of our determination that there is no ambiguity in the policy defendant cannot be said to have acted reasonably and prudently in refusing to pay claimant under the provisions of its own *651 policy which refusal clearly entitles plaintiff to benefits under the penalty statute."
Herein, defendant contends that the Court of Appeal erred in awarding penalties and attorney's fees, because:
1. The actions of the insurer in contesting payment were just and reasonable under the particular facts of this case, and certainly sufficient to put a prudent business man on his guard.
2. The required twelve month period of disability had not elapsed when the suit was filed, and hence there was nothing "due under the terms of the policy or contract." (LSA-R.S. 22:657.)
3. The policy had been terminated prior to the accident.
4. LSA-R.S. 22:657 under its wording does not apply to a specific loss indemnity of $50,000.00, and cannot be so construed without making the statute unconstitutional.
LSA-R.S. 22:657 (if it is applicable) sets forth that an insurer is liable for penalties and attorney's fees when it does not pay the amount due under its policy at the expiration of a certain recited time "unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist." The criterion, therefore, is "just and reasonable." "Whether such a delay is `upon just and reasonable grounds' depends upon the circumstances peculiar to the case in hand." Campasi v. Mutual Benefit Health & Accident Ass'n., 207 La. 758, 22 So.2d 55. See, Bankson v. Mutual Ben. Health & Accident Ass'n, 208 La. 1008, 24 So.2d 59. In the final analysis, the question of whether penalties should be inflicted in this type of case is a factual matter. Gleason v. Bankers Life & Casualty Company, La.App., 147 So.2d 86. It is elementary that the defendant, having set up a special defense must sustain it by a fair preponderance of the evidence. Bankson v. Mutual Ben. Health & Accident Ass'n, supra; Kennison v. U. S. Letter Carriers' Mutual Benefit Ass'n, La.App., 132 So.2d 94. Cf. Catchot v. Delta Life Ins. Co., La.App., 57 So.2d 919. A contract of insurance, like every other contract, is the law between the parties, and every stipulation therein must be construed as written. Smith v. Washington Nat. Ins. Co., La.App., 178 So. 691. "An insurance policy is a contract, and the rules established for the construction of written instruments apply to contracts of insurance. Hemel v. State Farm Mutual Automobile Insurance Company, 211 La. 95, 29 So.2d 483. The words used in such a contract are to be understood in the common and usual signification, without attending so much to grammatical rules as to general and popular use. LSA-C.C. Art. 1946. Also, all ambiguities in the provisions of an insurance policy are to be construed in favor of the insured and against the insurer, subject to the qualification that if the intent of the policy is clearly evidenced by the terms of the contract, then the policy must be given a reasonable interpretation with relation to such intent. * * *" Liprie v. Michigan Millers Mutual Insurance Co., La.App., 143 So.2d 597. Where the question of law is res nova, reasonable men may differ on it. Landry v. Mutual Life Ins. Co. of New York, D.C., 56 F.Supp. 156; Smith v. Washington Nat. Ins. Co., La.App., 178 So. 691.
Herein, the question of law is res nova. We find that reasonable minds differed on an interpretation of the amendment rider to the policy; we conclude that more than misinterpretation existed among the parties. The trial court, as stated supra, decided the matter factually; defendant, insurer, sincerely believed and urged that the loss of use of plaintiff's left hand did not directly and independently of all other causes prevent plaintiff from performing any and all of the duties of his profession. The Court of Appeal interpreted the policy to mean that the loss of use of plaintiff's left hand must be caused directly and independently *652 of all other causes by the accident.
Initially, this matter could not have been decided against the insurer on the face of the policy; only after hearing of facts was the trial court able to decide that the defendant was legally wrong in its contention. We must, therefore, determine whether under its interpretation of its policy, supra, defendant's grounds for refusal of payment of plaintiff's claim were just and reasonable, such as would put a reasonable and prudent business man on his guard.
In its correspondence, supra, defendant stated to plaintiff and to plaintiff's attorney that it had in its file information which showed that the policy requirements had not been met. The insurer did not sit idly by after plaintiff presented his claim; it made an investigation of his cause. Phelps v. Southern National Insurance Company, La. App., 83 So.2d 463; Dance v. Southern Surety Co. of New York, La.App., 134 So. 725. Cf. Utterback v. American Security Life Insurance Company, La.App., 165 So. 2d 39. The trial court stated that defendant predicated its defense on information received from Dr. Hall, supra. This information is reflected in Dr. Hall's testimony which we have quoted supra; it discloses that because of a heart attack and a heart condition, Dr. Harmon could not practice surgery during the last half of 1959 and all during 1960. Plaintiff presented his claim during 1960, at which time his recovery from his heart condition would have been uncertain to a reasonable man. Many heart patients recover and return to a normal method of life; others succumb to the ailment. Dr. Nadler was presented as defendant's only medical witness, and it is reasonable to assume that defendant consulted him after plaintiff's claim was submitted. This doctor, as stated supra, did not believe that plaintiff should carry on the duties of his profession.
Under the facts and circumstances of this case, we conclude that defendant had just and reasonable grounds for refusing to honor plaintiff's claim; we find that the grounds would put a reasonable and prudent business man on his guard. Although legally wrong in refusing payment, we "cannot say such refusal was unreasonable, * *; otherwise the insurer in a justifiable, though unsuccessful, contest over its liability, would be assessed the statutory penalties. Such holding would, in effect, deny an insurer its day in court. Each case must depend upon its own facts and circumstances. Jones v. Standard Life & Accident Insurance Co., La.App., 129 So.2d 84; Thibodeaux v. Pacific Mutual Life Insurance Co., 237 La. 722, 112 So.2d 423, 75 A.L.R.2d 1228; Finley v. Hardware Mutual Insurance Co., 237 La. 214, 110 So.2d 583." Militello v. Bankers Life & Casualty Company, La.App., 141 So.2d 454.
Penal and punitive statutes are not favored by the courts, and it would be entirely inequitable under the facts of this case to allow this plaintiff to recover penalties and attorney's fees, if the statute is applicable. Luce v. New Hotel Monteleone, La.App., 106 So.2d 121; Militello v. Bankers Life & Casualty Company, supra. Cf. Clevy v. O'Meara, 236 La. 640, 108 So.2d 538; Mitchell v. First National Life Insurance Company of Louisiana, 236 La. 696, 109 So.2d 61.
We find that defendant's Assignment of Errors Nos. 2 and 3 are no longer issues in this case. The question of defendant's liability under the terms of the policy was affirmatively determined by the trial court, and the Court of Appeal affirmed the judgment of the trial court.
We now pass to the question of the applicability vel non of LSA-R.S. 22:657, Payments of claims; health and accident policies; penalties, which provides:
"A. All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon *653 which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist. The insurer shall make payment at least every thirty days to the assured during that part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments. Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court. The district court of the parish where the insured lives or has his domicile shall have jurisdiction to try such cases.
"B. All claims for accidental death arising under the terms of health and accident contracts where such contracts insure against accidental death shall be settled by the insurer within sixty days of receipt of due proof of death and should the insurer fail to do so without just cause, then the amount due shall bear interest at the rate of six percent per annum from date of receipt of due proof of death by the insurer until paid."
LSA-R.S. 22:656 provides a 6% penalty for non-payment of life insurance policies within sixty days from the date of receipt of due proof of death. LSA-R.S. 22:658 provides a 12% penalty for non-payment of claims on policies other than life and health and accident. Section A of LSA-R.S. 22:657, supra, provides for a 100% penalty, and Section B thereof, supra, provides for a 6% penalty.
We believe that an assessment of a penalty of 100% on a lump sum payment, which under the present policy could be as high as $100,000.00, could approach being excessive and intimidate the insurer from contesting the validity of claims. Cf. State v. Great Atlantic & Pacific Tea Co., 190 La. 925, 183 So. 219. It could also be violative of due process. However, we do not find that defendant urged the unconstitutionality of the instant statute in the trial court, nor do we find it necessary to answer defendant's contentions urged in this Court with respect to the alleged unconstitutionality of the statute.
A reading of Section A of LSA-R.S. 22:657, supra, clearly shows that the Legislature intended that this section be applicable to small claims (hospital, medical, etc.) and monthly disability payments. Such intent is expressed in the sentence, "The insurer shall make payment at least every thirty days to the assured during that part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments." Immediately following the preceding sentence is the 100% penalty provision. LSA-R.S. 22:657 expresses no intent to award a 100% penalty on a lump sum which could be as high as $100,000.00. We conclude that the penalty provision and attorney's fees provisions of LSA-R.S. 22:657 are not applicable to plaintiff's claim.
For the reasons assigned, that part of the judgment of the Court of Appeal which awarded plaintiff $50,000.00 penalties and $20,000.00 attorney's fees, together with 5% interest from judicial demand, is reversed and set aside. All costs in this Court to be borne by plaintiff.
NOTES
[1] Certiorari was limited to a consideration of the question of penalties and attorney's fees.
[2] 164 So.2d 397.
[3] Issue No. 1 was, "Did Dr. Harmon sustain an injury to his hand, which directly and independently of all other causes prevent the insured from performing any and all duties of his profession for a period of twelve consecutive months?"

Issue No. 3 recites, "Was the refusal of the defendant company to pay benefits under the policy arbitrary and capricious, and if so, is the penalty in connection therewith governed by the Louisiana law (forum) or the Illinois law (the jurisdiction where the contract was entered into)?"
[4] "(a) on the date the Group Policy issued to the American College of Surgeons is terminated; (b) on the date the Insured retires or voluntarily ceases to be actively engaged on a full time basis in the duties of his profession; (c) on the date the Insured ceases to be a member of the Holder; (d) on the premimum due date following the Insured's seventieth birthday; * * *"