REGAN, Judge.
This suit was instituted by the plaintiffs, Anieta Utterback Cunniffe and Leonard A. Ferrell, as the sole heirs of the late Zella B. Utterback, endeavoring to recover the sum of $700.00 as reimbursement of expenditures incurred for hospitalization, laboratory tests, medicine, and oxygen in conformity with the provisions of two insurance policies issued to the decedent by the defendant, American Security Life Insurance Company. Plaintiffs also request the rendition of a judgment for penalties and *40 attorney’s fees for unreasonable refusal to pay the foregoing amount in accordance with the statutory law of this state.[1]
Defendant answered, basing its defense on the theory that the expenditures sued for were not encompassed by the terms of the policies since the disease which caused the insured’s hospitalization existed prior to the date of the issuance thereof. Defendant also reconvened to recover $95.00, which it had previously paid under the policies.
From a judgment in favor of the defendant, the plaintiffs have prosecuted this appeal.
The record reveals that on September 25, 1958, the defendant issued to Zella B. Utter-back a “Hospital and Surgical Expense Policy” and a “Hospital Room Expense Policy”, and that the premiums thereon were paid through December 19, 1961, when the policies were canceled by the defendant. When the contracts of insurance were issued, the insured had attained the age of seventy-four years.
On September 23, 1961, the insured was admitted to the Hotel Dieu, a hospital located in the City of New Orleans, and incurred therein the expenses which form the subject matter of this suit. She remained therein on this occasion until November 26, 1961. It is undisputed that if the defendant is liable under these policies, the amount due is $795.00, subject to a credit of $95.00 for part of the insured’s expenses paid by the defendant on November 14, 1961.
The clause of the policy upon which defendant predicates its defense provides that Mrs. Utterback is insured “from sickness the cause of which originates while this policy is in force and more than 15 days after the date hereof.” The defendant thus denies coverage on the ground that Mrs. Utterback’s hospitalization was brought about because of hypertension, heart disease, and related conditions which existed prior to the issuance of the policies.
Therefore, the question posed for our consideration is whether the insured was hospitalized solely as a result of a sickness the cause of which originated prior to the effective date of the contracts of insurance.
The defendant requested the appearance of two physicians as witnesses on the trial hereof in an effort to prove that the cause of the insured’s illness predated the policy. The first was her personal physician, Dr. Robert E. Gillaspie, who treated the insured at the time of her hospitalization and for several years prior thereto. The second was Dr. L. M. Redding, the Medical Director of the defendant insurer, who never examined the insured but testified solely from her medical and hospital records. A careful analysis of the testimony of these two physicians convinces us that there exists no doubt whatever that the insured suffered from high blood pressure and heart disease prior to the issuance of the policies by the defendant.
However, relative to the reason for the insured’s hospitalization on September 23, 1961, Dr. Gillaspie, the treating physician, very pertinently testified as follows:
“BY MR. RAINOLD:
“Q. You were in charge of the lady at the time she was in Hotel Dieu, the fatal illness? She was admitted September Twenty-third of 1961?
“A. That’s correct.
“Q. What did the lady die from?
“A. Well, at the time she was admitted I got the impression she had a cerebral thrombosis. She was admitted in the semi-comatose state. That was my diagnosis. This is a condition which is closely akin to a stroke. There was some slight difference, however, and we see it as a result of age. *41 By cerebral thrombosis I mean that the arteries, or some arteries in the brain become occluded and eventually a clot forms in the artery and any part of the brain that the artery is feeding oxygen does not get the blood and it regresses or dies, becomes dead tissue.
“Q. What significance does the hypertensive condition and high blood pressure have to the condition you have just described?
“A. I don’t see that it would go hand in hand. Again, I’d say that I have seen people with cerebral thrombosis who haven’t high blood pressure, never had it, and you see them with both situations. I don’t believe the two are related. We make a distinction now from a stroke or a cerebral vascular accident that goes hand in hand with pressure.
“Q. Did you have any evidence she had a cerebral accident?
“A. No, sir, I didn’t, and I have reasons for that. I’ll be glad to explain them.
“Q. I don’t know if that’s significant at this time.
“A. All right.
“Q. What was the condition of her heart when she was in the hospital, Doctor? Would you like to see the Hotel Dieu record? Do you have a copy of it there ?
“A. I don’t believe. I don’t have a copy of the record, no.
“Q. I hand you, Doctor, an exhibit known as Defendant D-Four, which is previously introduced and which is a copy of the Hotel Dieu record of admission, starting September Twenty-third of 1961?
“A. What was the question, please, sir?
“Q. The question was what was the condition of the heart at the time she was in the hospital then, Doctor?
“A. Well, I made a note, my own note, that she was again in this state of congestive heart failure she had been in, in 1956.
“Q. Uh huh?
“A. And, of course, that’s reasonable because here is a patient that is comatose. Naturally, it has quite an effect on the heart and that’s part of the diagnosis.
“Q. Doctor, did you have any note or recollection that the patient had suffered a stroke on April of 1961?
“A. No, sir, I certainly don’t because I saw her in March of 1961 and as far as I know, she didn’t have any stroke in April of 1961. I’m sure I would have known about it.
“Q. Did you at any time treat her for a stroke previous to the time she entered Hotel Dieu on September Twenty-third of 1961 ?
“A. Well, now, there seems to be— it seems like I visited her at home on several occasions and it could have been around that time. The dates — at which time again, I thought she was having this cerebral angio-spasm, or thrombosis, at which time this was my impression. Now that you recall that to my mind, that’s correct.
“Q. I show you the hospital record marked D-Four, and I call your *42 attention to Page Two, the opening note, and ask you to read it, Doctor.
(Document read silently by the witness.)
"A. Okay, as much as I can make of it.
“Q. Tell the Court what effect the stroke 'had, we have been discussing, which occurred on approximately April of 1961, on this patient?
"A. Well, you will note that that history is taken by this extern, I suppose from the daughter and 'stroke’ is in quotation marks. I have tried to explain to the best of my ability that in my opinion the lady didn’t have a stroke in April, but rather a cerebral thrombosis or an angio-spasm and it is quite important.
“Q. What effect did the angio-spasm have on her physical condition ?
“A. I don’t imagine- — well, I know her physical condition certainly wasn’t bettered by it.”
Moreover, the Hotel Dieu’s admission and discharge record, prepared in Dr. Gil-laspie’s handwriting and signed by him, contains the following entries:
"ADMITTING DIAGNOSIS A.S.H.D. S Failure
‘‘Cerebral Thrombosis "FINAL DIAGNOSIS Same”
In the course of oral argument before this court we were very impressed with the position that the defendant had maintained in refuting this claim. However, after reading the foregoing uncontradicted testimony of the defendant’s own medical witness that the insured was admitted to the hospital for cerebral thrombosis as well as congestive heart failure, our initial impression has been changed as a result thereof, and we are now led to the inevitable conclusion that the defendant’s denial of coverage is not well founded.
The record is devoid of any evidence which would even tend to indicate that the insured suffered from cerebral thrombosis prior to the issuance of the policies. Since the insured was hospitalized for an ailment which did not predate the policies, the mere fact that she was simultaneously suffering from a pre-existing disease cannot serve as a basis for denying coverage. The facts hereof reveal that the expenses incurred for the treatment of cerebral thrombosis cannot be separated from those incurred for the heart condition; therefore, the defendant must fully comply with its obligation to pay the insured’s medical and hospital expenses in conformity with the provisions of its policies.
We are not convinced that the attitude of the defendant in refusing to pay the insured’s claim justifies the imposition of penalties and attorney’s fees. There was sufficient legitimate dispute, we feel, as to the nature of the insured’s illness to prevent the defendant’s refusal from being classified as unreasonable under LSA-R.S. 22:657, which provides that unless a just claim is paid within thirty days after demand the insurer shall be subject to a penalty of double the amount of health and accident benefits due, together with attorney’s fees to be determined by the court.[2]
For the reasons assigned, the judgment of the lower court is reversed, and judgment is now rendered in favor of plaintiffs, Anieta Utterback, wife of James G. Cun-niff e, and Leonard A. Ferrell, in the full sum of $700.00, together with interest thereon from date of judicial demand until paid, and for all costs incurred herein.
Reversed and rendered.

. LSA-R..S. 22:657.

. See Smith v. Washington National Ins. Co., La.App., 178 So. 691; McKinney v. American Security Life Ins. Co., La.App., 76 So.2d 630.